ANTHONY LEONE, an Infant, by ROSEMARY LEONE, His Mother, et al., Respondents, v CITY OF UTICA, Appellant.

Fourth Department, February 28, 1979

**APPEARANCES OF COUNSEL**

*Lawrence P. George, Corporation Counsel* (*Bernard Samuels* and *Eric M. Alderman* of counsel), for appellant.

*Wolfe & Kalil* (*Earle C. Bastow, Waddie N. Kalil* and *John E. Hunt* of counsel), for respondents.

## OPINION OF THE COURT

DILLON, J.

We are here concerned with the liability which may befall a municipality for injuries sustained by a child on railroad property located adjacent to a city-owned and regularly used park and playground. While the degree of care to be imposed upon a municipality in a particular case is necessarily dependent upon the attendant circumstances and is thus ordinarily a jury question (*Caldwell v Village of Is. Park*, 304 NY 268), it is the claim of the defendant City of Utica that the plaintiffs should be foreclosed from recovery as a matter of law. We disagree.

Gilmore Park, an irregularly shaped parcel of land consisting of approximately nine acres, was acquired by the city in 1948. The major portion of its east line fronts on Hazelhurst Avenue and on the west it borders the Erie Lackawanna Railroad property for a distance of 717.73 feet. Its southern boundary adjoins a small strip of privately owned land which in turn borders Zoar Avenue, an unimproved street.

Within the easterly portion of the park and transversing its entire length from north to south is a land depression or ravine which varies from 25 to 30 feet in width and from four to eight feet in depth. Although the park land west of the ravine is heavily wooded and rugged, it contains several footpaths, a "tree fort" and rope swings tied to trees. Many of the footpaths lead to the railroad property along the western line of the park, and it also appears that some lead to the park's southern boundary. The land south of the park, including the Zoar Avenue extension and the property to its south, is also wooded and rugged in similar contour to that of the westerly park land.

In 1969 the city developed a playground in the southeastern corner of the park. Neither the playground nor the larger park area was enclosed by fencing and thus there were no formidable obstacles or barriers between the playground and the remainder of the park, or between the park and the railroad property. The playground was constructed for the use of children residing in a neighboring housing complex owned by the city's municipal housing authority and known as Gilmore Village. While there had been children's outdoor play equipment within the housing complex at one time, it was removed upon development of the park playground, and thereafter the children were discouraged from outdoor play on the project grounds.

During the afternoon of August 24, 1970, eight-year-old Anthony Leone left his apartment in Gilmore Village and crossed Hazelhurst Avenue to play in Gilmore Park. While city personnel had been assigned to the playground during the summer of 1970, they did not appear after August 15th. Anthony, who played in the park nearly everyday that summer, met his friends in the playground and they walked through the ankle-deep water in the ravine and into the woods where they played and chased each other. Upon hearing a train whistle he and the other children, according to his testimony, ran from the park in a westerly direction to the railroad tracks to wave at the trainmen. He climbed up a five-foot incline to reach the railway and began to run after the northbound, slowly moving train. He was near the end of the train when he slipped and fell beneath it. The other children ran away and he crawled a short distance toward the path which he had used to reach the tracks. Help arrived within a few minutes and Anthony was removed to a hospital where his right leg was amputated.

Although Anthony testified that the accident occurred near the middle of the park's west boundary line, a police officer and an ambulance attendant each testified that Anthony was found south of the Zoar Avenue extension, approximately 220 to 250 feet southwesterly of the southwest corner of Gilmore Park. Based upon the latter testimony as to Anthony's location following the accident, the city takes the view that he arrived on the railroad property from privately owned land and not directly from its park land.

Initially, the city urges that it owed no duty to Anthony. It is well settled, however, that the "city owes to those who use its parks a duty of ordinary care against foreseeable danger (see, e.g., *Caldwell v Village of Is. Park,* 304 NY 268, 274)." *(Scurti v City of New York,* 40 NY2d 433, 445 [BREITEL, Ch. J., concurring in part and dissenting in part]; see *Lukasiewicz v City of Buffalo,* 55 AD2d 848.) Consistent with that duty, the degree of care to be exercised must take into account the known "propensity" of children "to roam and climb and play" *(Collentine v City of New York,* 279 NY 119, 125).

The record sufficiently establishes that young children often played in the wooded area of the park west of the creek and it may fairly be inferred that the city was aware of that activity and made no effort to prevent it. Additionally, the city had knowledge of the location of the railroad tracks and that

pathways in the park lead to those tracks. Certainly the jury may have found, in view of the foreseeable danger of serious injury presented by the location of the railroad tracks (cf. *Baltimore & Ohio R. R. Co. v Goodman,* 275 US 66, 69), that the failure of the city to fence its playground or park, or to supervise the use of the park or to take some other reasonable precaution to prevent or discourage children from going onto the railroad property, constituted a lack of ordinary care (cf. *Jacques v Village of Lake Placid,* 39 AD2d 163, affd 32 NY2d 739). While the city might have introduced proof showing that it would have been unduly burdensome to take measures to avoid the risk of harm presented here (see *Scurti v City of New York, supra,* p 442), it did not do so.

The city also argues that its conduct was not the proximate cause of Anthony's injury. This court is bound to assume, however, that the jury adopted that view of the evidence most favorable to the prevailing parties *(Calabrese v County of Ontario,* 58 AD2d 1008; *Colegrove v City of Corning,* 54 AD2d 1093). Anthony testified that he was playing in the park when he heard the train whistle and he then ran along one of the footpaths directly to the tracks. While the path Anthony used may have led from the park over private property and then to the tracks, neither the actual place of his exit from the park nor the precise location of the accident may be said to be so remote as to require a determination, as a matter of law, that the injury was not proximately caused by the city's negligence. The jury properly may have found that the city's breach of duty was a substantial factor in bringing about this foreseeable occurrence (see *Quinlan v Cecchini,* 41 NY2d 686, 696; *Scurti v City of New York,* 40 NY2d 433, *supra).* Since there were no barriers or apparent line of demarcation between the park land and the contiguous property, it could reasonably have been anticipated that an infant, attracted by a train whistle, might take a path leading from the park and across that property to the tracks. The jury permissibly could have found that a fence along the boundary between the park and the private property would have prevented this accident. Thus viewed, the issue of liability was properly submitted to the jury as a question of fact (see *Lukasiewicz v City of Buffalo,* 55 AD2d 848, 849, *supra).*

Other issues raised by the city require comment. It is argued that there should be a reversal because the notice of claim served pursuant to section 50-e of the General Munici-

pal Law failed accurately to describe the place of the accident. The notice states, in pertinent part, that the accident occurred "on the extension of Zoar Street at the Erie Lackawanna Railroad tracks." The only proof offered by the plaintiffs concerning the location of the accident, however, indicated that it took place approximately 500 feet north of the area identified in the notice of claim.

The purpose of requiring a notice of claim is to assure the recipient "an adequate opportunity to investigate the circumstances surrounding the accident and to explore the merits of the claim while information is still readily available. [Citations omitted.]" *(Teresta v City of New York,* 304 NY 440, 443.) Here the notice furnished information sufficient to enable the city to conduct a proper and timely investigation of the accident. Indeed, the evidence introduced by the city indicated that the accident did, in fact, occur near the Zoar Avenue extension as stated in the notice of claim.

The disparity between the notice and the plaintiffs' testimonial version of the accident might well have been earlier discovered had the city exercised its opportunity to conduct a pretrial examination of Anthony. In any event, the statute authorizes the court to correct or disregard a defective notice of claim if "it shall appear that the other party was not prejudiced thereby" (General Municipal Law, § 50-e, subd 6). In the circumstances presented, it may not be said that any error in the notice prejudiced the city (see *Rivero v City of New York,* 290 NY 204, 208).

Finally, the city claims that the trial court erred in denying its motion to amend its answer by asserting a cross claim against the Erie Lackawanna Railroad Company after the court, over its objection, had granted plaintiffs' motion for a voluntary discontinuance of their action against the railroad. The motion to discontinue and the motion to amend were made after the parties had completed opening statements. The railroad was involved in bankruptcy proceedings and plaintiffs neither received nor had an agreement to receive any consideration in exchange for the voluntary discontinuance. Thus, the discontinuance constituted neither a release nor a covenant not to sue. In such circumstances, plaintiffs' claim was not reduced within the meaning of section 15-108 of the General Obligations Law.

While it may have been preferable, in the interest of judicial economy, to have granted the city's motion to amend

its answer to include a cross claim against the railroad, our inquiry now necessarily focuses upon the city's rights under CPLR article 14 (§ 1401 *et seq.*). That article, largely born of the decision in *Dole v Dow Chem. Co.* (30 NY2d 143), represents the codification of rights of defendants and potential defendants *inter sese,* including the rights of contribution unfettered by prior limitations, the new right of apportionment of damages according to the measure of fault, and the preservation of the remedy of indemnification. Significantly, however, article 14 made no change in the rule that a successful plaintiff could collect his judgment in whole or in part from any one of the joint judgment debtors. In short, other than incidentally, the statute neither enlarged nor diminished the rights of plaintiffs *(Klinger v Dudley,* 41 NY2d 362).

Our concern here, then relates to the prejudice which may have been worked upon the city by virtue of the trial court's rulings. Clearly, the city was deprived of an immediate opportunity to have its fault apportioned with that of another defendant. The interposition of a cross claim, however, would not have affected plaintiffs' rights against the city (see *Klinger v Dudley, supra,* p 367; Siegel, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 3019 [Cumulative Annual Pocket Part, 1978-1979], p 25). The trial court's denial of the motion does not require a new trial since the city may institute a separate action for contribution against the railroad (see CPLR 1403).

In reaching that conclusion, we are not unmindful of the holding in *Gannon Personnel Agency v City of New York* (57 AD2d 538). There several defendants were found to be liable and, as to them, the allocation of the share of fault of the insolvent defendant, whose potential liability was not submitted to the jury, was vital in fully assessing their respective shares of fault. There is no such pertinency here. Importantly, a new trial of this action would not entitle the city to relitigate the issue of its liability or the extent of plaintiffs' damages (see *Lisio v Ranchose Realty of Corona Corp.,* 36 NY2d 739, modfg 42 AD2d 996; *Gannon Personnel Agency v City of New York, supra).* This rule was recognized in *Cimino v City of New York* (54 AD2d 843, affd 43 NY2d 966) but because of the complexities in that case, not present here, the court was unable to apply the rule. Nor may the city rely upon *Carey v AAA Con Transp.* (61 AD2d 113) as support for a contrary result since there the reversal of plaintiff's verdict against the

one remaining defendant was based upon trial error which prejudiced that defendant.

Accordingly, the judgment should be affirmed.

CARDAMONE, J. (dissenting). We respectfully dissent because the record fails to reveal evidence of any negligence on the part of the defendant, City of Utica.

As the majority state, it is well settled that a landowner may be liable for injuries that occur on his property or, in some circumstances, on nearby property. That is not to say, however, that a landowner is an insurer of all who come upon his property; his liability is not endless, but limited by basic principles underpinning the fault theory of tort law—reasonable care and proximate cause. Today the majority have ignored these principles and hold a landowner liable for an accident that occurred on the property of another, a substantial distance from the landowner's property and having only the most tenuous connection with it.

Gilmore Park is a "park" in name only. Except for a playground area, Gilmore Park is neither groomed nor maintained. For the most part it is a rough and heavily wooded area upon which no improvement has been made. Its topography is indistinguishable from that of the private lands that border it on the north and south. Long before the playground was built, it and the neighboring tracts had been used by the local residents as a place to play or take walks. Gilmore Park and the adjoining private parcels are interlaced with trails and paths. There is no indication in the record that the construction of the playground caused more children to enter the wooded area of Gilmore Park than had previously used it.

The plaintiff, who was eight years old at the time of the accident, testified at this trial seven years later (aged 15) that he was injured on the railroad tracks at a point approximately midway on the western boundary of Gilmore Park. However, the credible evidence of the police officer and the ambulance attendant who came to the scene to render aid to plaintiff proves that the plaintiff was injured much further south, at a point 250 feet southerly of the southern boundary of Gilmore Park and approximately 600 feet from the playground. Plaintiff virtually concedes as much in his brief. Other testimony by the plaintiff that he chased the northbound train toward the park is further proof that he and his companions had wandered even further south and were at a greater distance

than 600 feet from Gilmore Park immediately prior to the accident.

At the trial the plaintiff contended that the city negligently maintained Gilmore Park and that this negligence was what caused his injury. Negligence, of course, is the failure to conform one's conduct to a "standard established by the law for the protection of others against unreasonable risk of harm" (Prosser, Law of Torts [4th ed], p 146). The duty of care that the city, as a landowner, owed the plaintiff is measured by a "single standard of reasonable care under the circumstances whereby foreseeability shall be a measure of liability" (*Basso v Miller*, 40 NY2d 233, 241). Foreseeability is a difficult measuring rod to apply. It is to be determined by considering the circumstances as they existed prior to the injury. Its application comes, however, only after the event has occurred when, with the gift of hindsight, it is tempting to conclude that an event was foreseeable. Liability attaches only when one disregards a risk that reasonably could have been perceived. When the city established a playground in Gilmore Park it was foreseeable that children might be injured on the apparatus installed there or that children using the playground might enter the nearby woods and fall into Hallecks Ravine.

The testimony at the trial shows that this plaintiff entered Gilmore Park at the playground and then, by a meandering route, proceeded out of the "park", across several privately owned lots, over an area known as Zoar Avenue (a "paper" street), crossed more privately owned land, and finally came to the Erie Lackawanna roadbed. In the process of traveling over more than 600 feet of rough terrain, plaintiff negotiated an eight-foot deep ravine and climbed a five-foot high embankment. As the train proceeded northward the plaintiff, an eight-year-old boy, was able to catch up to and pass at least the last car. Then, according to his testimony, while running along the east side of the train he "either tripped or something". The wheels of one of the cars then passed over his right leg almost completely severing it.

In our view it was not reasonably foreseeable that this eight-year-old child would leave the playground, traverse this much territory and eventually be injured by a train traveling so slowly, i.e., eight miles per hour, that this youngster could successfully chase and catch up with it. Since this accident was not reasonably foreseeable, the city owed the plaintiff no

duty to protect him from it. To create such a duty, as the majority does, is to require that barriers be built and maintained surrounding every parcel of the land upon which children may come regardless of the remoteness of the risk. To cast a landowner in liability for its failure to undertake these measures is unfairly and unduly burdensome.

Not only was the city not negligent, but no act or omission on the part of the city can be held to have caused this tragic accident. Determining legal or proximate cause consists of more than the mere application of the principle *sine qua non,* much less the invocation *post hoc ergo propter hoc.* Some of the tests found useful in determining whether proximate cause exists are the status of the plaintiff, temporal duration, spatial duration, foreseeability and public policy *(Pagan v Goldberger,* 51 AD2d 508). Many events may contribute to an accident, but all are not necessarily the proximate cause of it. Proximate cause is a flexible, almost intuitive, doctrine that extinguishes liability at a point dictated by common sense, policy and a "rough sense" of justice *(Ventricelli v Kinney System Rent A Car,* 45 NY2d 950). In this case time and distance eroded any legal relationship between the plaintiff and the city created by plaintiff's original presence at the playground. As noted, the injury was not foreseeable and there is no public policy that a municipality becomes the insurer of every person who can retrace his path from point of injury to a parcel of public property, no matter how far removed.

In addition, it is difficult to conceive how the precaution suggested by the plaintiff and adopted by the majority would have prevented this accident. Warning signs plainly would have been no more effective to this eight year old than the verbal warnings plaintiff's mother testified that she gave, and which plaintiff acknowledged receiving, concerning the specific tracks where plaintiff was injured. Neither a supervisor nor a fence around the playground would have prevented the plaintiff from leaving, because children freely came and went in the playground. Given the nature of the terrain, children's activity in the remainder of Gilmore Park could not have been supervised in any practical way. A fence completely enclosing Gilmore Park, though it might have dissuaded a person from leaving the "park", would not have prevented a person from reaching the railroad tracks from the adjoining properties. Thus, to claim that this nine-acre parcel should have been

enclosed by a fence is both impractical and unfeasible; and to claim further that it would have prevented the accident is highly speculative conjecture.

We do not find as the majority do a precedent for their holding in *Lukasiewicz v City of Buffalo* (55 AD2d 848) or in *Scurti v City of New York* (40 NY2d 433) where the complaint against the city was founded on "the negligent maintenance of its park fence all but abutting on the railroad yard with its overhead electric wires and boxcars used for play by children and adolescents." *(Scurti, supra,* p 443, concurring opn per Chief Judge BREITEL.) The asserted liability here is based not on the city's failure properly to fulfill some duty it has undertaken to perform such as maintaining a fence as in *Lukasiewicz* and *Scurti,* but rather on the failure of the city to fulfill a responsibility it has not elected to assume—that of protecting plaintiff from harm by erecting a fence or providing supervision or other means of keeping plaintiff from finding his way from the playground over adjoining property to the railroad. Therein, we think, lies the crucial distinction (see *Florence v Goldberg,* 44 NY2d 189, 197, 198; *Weiss v Fote,* 7 NY2d 579, 587; *Moch Co. v Rensselaer Water Co.,* 247 NY 160, 167). In order to reach this result, the majority have misapplied the rule.

In short, one must conclude that this verdict was a product of understandable sympathy from a jury swayed by the exhibition of the plaintiff's very serious injury and the passion evoking testimony of a doctor who described the terrible and intense pain that this youthful plaintiff suffered. It is the duty of a court to examine the facts and determine whether those facts will, as a matter of law, support a finding of negligence (cf. *Quinlan v Cecchini,* 41 NY2d 686, 689); and, assuming negligence, whether that negligence was the proximate cause of the injury *(Ventricelli v Kinney System Rent A Car,* 45 NY2d 950, *supra).*

Since there is no proof that the city was negligent, we vote to reverse the judgment and dismiss the complaint.

MOULE, J. P., and SCHNEPP, J., concur with DILLON, J.; CARDAMONE and HANCOCK, JR., JJ., dissent and vote to reverse the judgment and dismiss the complaint in an opinion by CARDAMONE, J.

Judgment affirmed, with costs.