NOHEMI COLLS, Adm'r of the Estate of Daniel Colls, Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO *et al.,* Defendants-Appellees.

First District (5th Division) No. 1—88—2243

Opinion filed April 19, 1991.

Asher, Pavalon, Gittler & Greenfield, Ltd., of Chicago (Eugene I. Pavalon, Gary K. Laatsch, and Ladonna L. Steiner, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Michelle A. Hutchinson, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Nohemi Colls, as administrator of the estate of Daniel Colls, her minor son, brought a wrongful death action against defendants, the Chicago and North Western Transportation Company (C & NW) and the City of Chicago (the city), alleging that defendants' negligence caused her son to be struck and fatally injured by a commuter train, and requesting damages. (Ill. Rev. Stat. 1977, ch. 70, par. 1 *et seq.*) Following a jury trial in the circuit court of Cook County, a general verdict was returned in favor of both defendants, and judgment was entered thereon. Plaintiff appeals from the judgment and from the denial of her post-trial motion to set aside the verdict and for a new trial.

On appeal, plaintiff contends that several trial court errors, either individually or by their cumulative effect, denied her a fair trial on the merits. She raises the following issues for our review: (1) whether the trial court erred in modifying the pattern jury instruction on the plaintiff's burden of proof (Illinois Pattern Jury Instructions, Civil, No. 120.04 (2d ed. 1971)), so that the instruction contained an additional element of proof and misstated the applicable law; (2) whether the trial court abused its discretion by failing to order a mistrial or further limit the testimony of a defense witness following the late disclosure of relevant documents which had been requested during discovery; (3) whether the trial court committed reversible error by striking certain allegations of plaintiff's complaint regarding issues on which the jury had heard evidence, and by subsequently refusing to instruct the jury on the issues raised by those allegations; and (4) whether the trial court committed reversible error in permitting defense counsel and defense witnesses to repeatedly characterize plaintiff's decedent as a "trespasser," where such status was irrelevant to the question of defendants' liability under the legal theory of the case.

The following facts relating to this tragic occurrence are undisputed. On August 19, 1978, at approximately 11:30 a.m., 12-year-old Daniel Colls was struck and killed instantly by a commuter train operated by C & NW (hereafter referred to as the railroad) on its northwest line from the suburbs into its Chicago terminal. Daniel and an eight-year-old friend, John Spaw, had been walking along tracks owned and maintained by the railroad at a location about 1½ blocks from the Colls family residence. The boys were searching for discarded railroad spikes for use in the construction of a tree house which neighborhood children were building on a strip of city property adjacent to the railroad right-of-way. The property in question is located along the southwest side of North Irene Avenue in Chicago. It runs on a diagonal, for about 250 feet, between North Kedzie and West Belmont Avenues. The railroad tracks at this location also run in a southeasterly and northwesterly direction, parallel to Irene Avenue, on an embankment rising from the city-owned land. The tracks cross over Kedzie and Belmont Avenues by means of steel-girded bridges, or viaducts. At the time that he was struck by an in-bound train, plaintiff's decedent was on the Kedzie Avenue bridge. The parties agree that the railroad was operating its train properly; no issues relating to train operation or maintenance were raised at trial.

On January 24, 1979, plaintiff filed her complaint, charging the railroad and the city with conduct proximately causing Daniel's death, under a negligence theory based on *Kahn v. James Burton Co.* (1955),

5 Ill. 2d 614, 126 N.E.2d 836. The complaint alleged that the railroad permitted a dangerous condition to exist on its premises which involved an unreasonable risk to children, including the decedent. It further alleged that the railroad and the city knew, or should have known, that children had frequently played at the tracks and on the adjacent embankment and city property, for some time prior to August 19, 1978, and that the children, due to their immaturity, were not able to appreciate the dangers and hazards of the tracks. The complaint stated that well-worn paths extended up the embankment, on the property of both defendants, and that numerous railroad spikes and a tree house were located in the same area. The complaint specifically charged the railroad, *inter alia*, with negligence in failing to: (1) barricade or fence off its elevated tracks; (2) maintain warning signs on and around these tracks; (3) warn children of the dangers and hazards of playing at the tracks, although they knew that children, including plaintiff's decedent, would not appreciate the danger involved in these activities; (4) maintain guards or other suitable personnel to prevent children from playing on the tracks; and (5) maintain the tracks so as to keep them free from objects which would attract children. The allegations of negligent conduct by the city included, *inter alia*, failure to: (1) barricade or fence off its property; (2) maintain warning signs in and around the property and railroad tracks; and (3) keep its property free from objects which would attract children to the tracks.

On April 8, 1980, plaintiff filed interrogatories to the railroad which, in part, requested as follows:

"Prior to August 19, 1978, did any agents, employees or representatives of [the railroad] have knowledge of persons crossing, standing on or near, or walking along [the] tracks at and adjacent to [the] Irene Street track segment? If so, please state the following:

(a) The name and last known residence and business address of any and all persons having such knowledge.

(b) The date or dates on which such knowledge was learned or observations of person crossing [the] tracks was made.

(c) For approximately how long prior to August 19, 1978, had such agent, employee or representative had such knowledge.

\* \* \*

Prior to August 19, 1978, had [the railroad] received any reports or complaints of children or other persons being upon the

right of way and/or tracks at the place of the occurrence alleged in Plaintiff's Complaint? If so, state the following:

(a) The date or dates on which each such report was received.

(b) The name and last known residence and business address of the person making each such report, and *** receiving each such report.

(c) The nature of the complaint or report on each such occasion.

(d) Identify by date, title, author, and name and address of the present custodian any and all documents pertaining to each such report, including but not limited to complaint reports, investigation forms, police reports, and incident reports."

Plaintiff also filed, on April 8, 1980, a "Notice to Produce [Documents]," including:

"One copy of any and all [railroad] police reports, investigation reports, spot reports, incident reports, complaints, or other documents showing instances when members of the public (particularly including children) were upon or crossing the railroad right of way at the place of and prior to the occurrence ***."

On April 18, 1980, the railroad answered the interrogatory relating to agents' knowledge of persons walking on or near the tracks "at and adjacent to" the Irene track segment by stating that there was "[n]o record of same." It answered the interrogatory requesting reports or complaints of persons on the right-of-way and tracks by stating, "See defendant's production response." Apparently, that answer referenced the railroad's "Response to Plaintiff's Notice to Produce," also filed on April 18, 1980, wherein the railroad answered the above-quoted request for police reports and similar documents by stating as follows:

"Defendant has *one* police report of a trespasser related to 8/3-8/4, 1978 where an *adult* trespasser was warned and released in the vicinity of Belmont Avenue." (Emphasis added.)

The police report so described was provided to plaintiff, and was later introduced at trial during her case in chief. It contains the designation, "Criminal Trespass to Land," and memorializes a complaint, received by "D. Hahne" on August 3, 1978, in the following words:

"Juveniles on North West Line at Belmont daily between 0800 & 0830. Commuter trains Nos. 630 and 632 reporting incidents."

The report further describes the "status of [the] investigation" into the complaint as follows:

"Reporting officer surveilled the subject location on 8/4/78, and one adult was observed running along (south) the right of way. Subject advised that he was enroute to work and was taking a short-cut. Subject warned and released with no further incident. Further contacts with trespassers will be reported on separate incidents."

The name and address of the adult trespasser, which also appear in the body of the report, bear no apparent relation to the parties or issues in this case. No other incident reports, or documents of a similar nature, were disclosed or provided to plaintiff during the course of discovery.

Trial commenced on March 22, 1988, following lengthy pretrial proceedings unrelated to this appeal. During his opening statement, counsel for C & NW referred to the railroad's problem with "trespassing," or "people c[oming] on [its] property without authorization." Plaintiff's objection to the use of the term "trespass" was overruled. After the opening statements, plaintiff moved for a mistrial on grounds that defendant's characterization of Daniel Colls and his playmates as trespassers had tainted the jury's perception of decedent and was out of place in a trial where plaintiff's status had no bearing on defendants' liability. The trial judge, stating that the jury would be clearly instructed on the burden of proof, and that he did not consider use of the term problematic, denied plaintiff's motion.

Several witnesses testified regarding the physical characteristics of the property in question. Among them was Geoffrey Burke, supervisor of surveyors in the C & NW suburban division at the time of the trial. Burke testified that he surveyed the area at the request of his superiors on September 1, 1978. At that time, he located a tree, with a wooden platform on it, at a distance of 61 feet from the middle of the center railroad track, toward Irene Avenue. Because the railroad's property extends 50 feet from the center track, he determined that the tree house was 11 feet outside railroad property.

Burke explained that many years prior to these events, a commuter passenger station had occupied the relevant property, and that a retaining wall, spanning the area between Belmont and Kedzie, had been constructed, probably to serve as the support for the passenger platform. He recalled that when he visited the area in September 1978, portions of this retaining wall, which was about two feet high, were "gone." He further estimated that, between the base of the tree containing the tree house and the top of the retaining wall, the ground rose about eight feet over a distance of 35 feet. He stated that he observed no fencing in the area.

Peter Studl testified that in 1978, he was retained by the Colls family as their attorney, in order to initiate this litigation. He further stated that he served in that capacity until 1980, when he asked the law firm of plaintiff's trial attorney to take over the case. Studl described his observations on September 21 and September 24, 1978, when he visited the stretch of railroad track where Daniel was killed, and the adjacent property, and took a number of photographs. He testified that on these occasions, he observed footpaths, worn into the grass, extending across the property from Irene Avenue "up to the railroad tracks." He also noticed a tree house in the group of trees located on the easterly part of the property. He described the tree house as about 10 to 15 feet off the ground, constructed from wooden planks. More wood, some buckets, and a mattress were placed at the bottom of the tree, and a thick rope and a chain hung from a tree limb. Studl further observed railroad spikes which had been driven into the side of the tree, going up to the tree house. Walking onto the tracks, he saw many of the same kind of spikes, lying "around the rail bed and the viaduct along the rail[s]."

Studl further testified that he observed a "deteriorating" and "crumbling" retaining wall at a point "up toward the tracks between the tracks and Irene [Avenue]." He stated that one of the footpaths led from the tree house, up the embankment, and onto the tracks where the retaining wall had crumbled, leaving a gap of about 20 yards. Studl also described a second path, which led from the "grassy area" onto the tracks, a third which went through a clearing in the brush, and a fourth that led up the side of the tracks, nearer Kedzie Avenue. He recalled walking most of the paths at the scene, and stated that he had no difficulty walking right up onto the tracks. He contrasted the gentle sloping near the center of the Irene Avenue property, where the wall had deteriorated, with the steeper climb necessary to scale the edges of the wall by the street corners at Belmont and Kedzie. Studl also testified that he saw no warning signs on either the embankment or the tracks.

On cross-examination, Studl further described the property as containing "lots of trees" and foliage. He estimated that the tree house which he saw was approximately 15 to 20 feet from the curb line of Irene Avenue, in a clump of trees between the street and the tracks. Studl also described how he sat along the tracks while several trains passed by. He stated that there was "a roar from the [Kennedy] expressway" and that he did not hear the trains coming until they were very close. It seemed that the trains would be off in the distance and then, suddenly, "there w[ould be] a very large noise

and the train w[ould be] there," an experience which struck him as "frightening."

Richard Bivins testified that in August 1978, he lived on Irene Avenue, directly across the street from the property in question. He described the area at that time as containing a lot of brush and many trees, with a tree house visible from the street. Bivins further stated that many children would play there every afternoon after school, beginning in May or June, and during the summer. He did not recall seeing any maintenance done on the property or any signs posted there. Bivins also stated that several times prior to the Colls accident, he had complained to both the railroad and the Chicago police department, and had been told that cutting down the trees or putting up fences was not feasible. He recalled that the police would drive by, but that children would return to the area as soon as the police left. Bivins further testified that he had complained to the Chicago police about 10 times in the two years prior to the accident. These complaints related to children playing on the Irene Avenue property, or throwing rocks, or teenagers coming on the property at night to set fires and drink under cover of the trees.

Susan Bivins corroborated her husband's testimony as to the lack of maintenance on the Irene Avenue property. She stated that both of them would sometimes pick up the wood that children had brought there and dispose of it. She further testified that she once telephoned the railroad to report that children were playing there and were building tree houses.

Wilma Miller, Richard Bivins' sister who lived at the same Irene Avenue address, testified that in 1978, children were playing hide-and-go-seek on the property across the street "every day." She related that she sometimes complained to police officers in passing squad cars, attempting to have them "run kids off the tracks and away from that area," but that the police responded that there was nothing that they could do.

Ernest Wicker testified that he lived on Irene Avenue, across the street from the property in question, from 1972 to 1981. Wicker stated that he had seen children as young as four years old go onto the tracks, which were easily accessible because the land sloped down, like a "walkway right up onto the tracks," where the railroad wall had collapsed. He further testified that only once in nine years had he observed someone who appeared to be a railroad employee surveilling the area.

Wicker also testified as to complaints he made to both the city and the railroad about maintenance problems on the Irene Avenue

property. He stated that the city and the railroad kept referring him to each other, and that he never got a satisfactory response. The railroad, in particular, told him that the property was owned by the city, not the railroad.

Judith Wicker, Ernest's wife, testified that prior to 1978, she telephoned the railroad at least monthly with complaints about the property between the Irene Avenue and the railroad tracks. The railroad responded that it was city property, and the city claimed that the problem was the railroad's responsibility. Mrs. Wicker further testified that she observed children as young as three years old playing in the area, and on the tracks, led by their seven-year-old siblings. She stated that she telephoned the railroad at least six times each year regarding the children. When on one occasion she requested the railroad to fence the area, she was told that a fence was not feasible because, if the railroad fenced that section of track, it would have to fence the entire city. She also testified that her son attended Daniel Colls' school and was his friend. She recalled that Daniel had some talent for drawing.

On cross-examination, Judith Wicker stated that, although she frequently warned children to stay off the property and off the railroad tracks, and that most of the younger ones would then leave, they often returned as soon as she went home. On redirect examination, she could not recall whether Daniel Colls had been present on any occasion when she warned the children.

Jose Colls, Daniel's father, testified that his family, including his wife, Daniel, and Daniel's seven-year-old sister, had moved into the neighborhood about 11 months before the accident. He stated that, prior to that time, the family had never resided close to any railroad tracks. Mr. Colls further testified that Daniel had completed the fifth grade in June 1978. He also stated that Daniel had never told him that he played on railroad tracks and had never given him the impression that he was familiar with trains. On the morning in question, he had granted his son permission to go out and play with some other boys for a short time, after he had already spoken with his mother about his plans.

The plaintiff, Nohemi Colls, described her neighborhood in 1978 as a quiet residential area. She stated that she did not know that there were any railroad tracks nearby. She further related that during the year prior to Daniel's death, he had repeated the fifth grade, and that his playmates during that year were younger than he was. She testified that her son had no discipline problems at school, and that he followed her instructions. Mrs. Colls corroborated her husband's testi-

mony as to Daniel's interest in drawing. Her testimony concerning the events of the morning was substantially the same as her husband's. She specifically remembered Daniel's asking her permission to go with the boys "to Albany [Street] to help finish building a tree house."

John Miller testified that, in August 1978, he was seven years old and a friend of Daniel Colls. He stated that he and Daniel had played on the property across the street from his home "all that summer." He explained that the children would just climb up to the tracks at the place where the wall was decaying. He generally described his own activities in the area as playing, running around, throwing rocks, and collecting spikes from the ground for use in building tree houses.

On cross-examination, Miller testified that when he arrived at the tree house on the morning of the accident, Daniel and some other children were already in the tree house. Later, when Daniel and another boy decided to go farther toward the tracks, he did not follow them. He stated that he had seen Daniel up on the tracks "almost every day" prior to the morning in question, but had never been on the tracks with him when a train passed by. Miller estimated that about 15 to 20 minutes passed between the last time that he saw Daniel and the time that the accident occurred.

Nineteen-year-old Michael Walsh testified that he had resided in the immediate neighborhood of the Irene Avenue track segment for his entire life. He recalled playing on the property in question for about five or six years, between the ages of 7 and 13, often going up on the railroad tracks. He testified that he and other children used the paths as short cuts along the tracks to reach stores and other interesting places in the neighborhood.

Walsh related that about two weeks before the accident, he, Daniel, John Spaw, James Quinn, and another boy had started to build a "clubhouse" in a 15-foot tree along the slope of the tracks. He explained that it was easy to find spikes for the tree house by walking along the tracks, where railroad repairmen had left them. Walsh further stated that during the month that he knew Daniel Colls, they had walked together on the tracks about four times. Although trains had passed them on these occasions, they did not pass "close enough to endanger [their] lives." Walsh further recalled that, on the day of the accident, he had run out of spikes while working on the tree house. Daniel and John Spaw volunteered to get some, while he and James Quinn remained at the tree. He estimated that four or five minutes passed before he learned of the accident. On cross-examination, Walsh

stated that, from the tree house, one could feel a passing train pull the breeze, the branches, and everything else up with it.

James Quinn testified that during the time that Daniel Colls and John Spaw were on the tracks looking for spikes, he was climbing up to the tree house and back down again, trying to determine the best placement for the spikes. He stated that he had his back turned away from the tracks during this 10- to 15-minute period.

John Robert Spaw testified that, on August 19, 1978, he was eight years old and a friend of Daniel Colls. On the day of the accident, he called for Daniel at his home about 11 a.m. Spaw stated that he and Daniel walked directly to a tree house on the Irene Avenue property. He testified that five boys, including Spaw, Daniel, Michael Walsh, and James Quinn, had been constructing the tree house together. After playing at the tree for a while, he and Daniel went to look for railroad spikes needed for climbing the tree. Spaw further testified that he had no difficulty getting up to the tracks by climbing "onto a cement wall which was about up to [his] neck." He did not remember where Daniel got access to the tracks, but stated that it was not at the same location. He also stated that there were no fences or other barriers impeding access to the tracks.

Spaw further testified that, once on the tracks, the two boys proceeded toward the Kedzie Avenue bridge, looking downward as they searched for spikes. Daniel, who was walking slightly ahead of Spaw, on the same track, continued all the way across the bridge, to a position near a train switch. Spaw stated that he followed Daniel only three-fourths of the way across the overpass, bending down as he walked along the girder because he was afraid that his mother might see him from "down the street." At that point, he stopped and remained where he was. Spaw further testified that, when he and Daniel were so positioned, the sound of a horn first brought the train to his attention. He recalled that he immediately looked up and saw the train, about two city blocks away, coming toward him. He shouted, "the train," and then turned around and ran southeast down the bridge. Spaw further testified that both he and Daniel looked up when they heard the horn, and that neither of them had seen the train before that time. Spaw stated that Daniel "jumped straight" where he stood, looking at the train. After Spaw had reached the end of the bridge, and had jumped off the side of the girder and away from the track, he caught another glimpse of Daniel. He stated that Daniel was then about six feet behind him, near the end of the bridge. When the train passed, all that Spaw could see was "the green and yellow

[train] and sparks from the wheels," and leaves flying around in the wind.

On cross-examination, Spaw stated that he and Daniel had been searching for spikes for about 10 minutes when the train came. He acknowledged that, while on the bridge, he had seen a light "off in the distance." Spaw further stated that he could not remember why he stopped at a position about three-fourths of the way across the bridge. He explained that at one point, Daniel walked off the bridge on its western end, next to the switch. Sometime between the moment when he saw the light in the distance and the time that he observed Daniel standing off the track, pulling at the switch, Daniel asked Spaw what he (Spaw) would do if a train came. Spaw answered, while laughing a little, that "[he]'d run." A few seconds later, the train arrived, blowing its horn four times. Spaw was asked whether he was aware, prior to this time, that the switch in question controlled the access of freight trains into the railroad yard (the Avondale Yard) by the Plywood Minnesota store on the other side of Kedzie Avenue. Spaw stated that he was. He also agreed that, behind the switch, the ground slopes gradually down into the lumberyard. Spaw further testified that there were areas along both Kedzie and Belmont Avenues from which a person could reach the same segment of track, without entering from Irene Avenue. On redirect examination, Spaw stated that he knew, on the day of the accident, that it was impossible for a person such as himself or Daniel to throw the switch at the end of the Kedzie Avenue bridge, because the switch was locked.

Donald Meisner, an assistant bridge engineer for the railroad, was the first defense witness. He testified that the Kedzie Avenue bridge was 105 feet long and 14.6 feet high, as measured from the base of the rail to the surface of Kedzie Avenue below. He also explained that the steel girders on the bridge are necessary both to support the rails and to prevent anything from falling into the street. On cross-examination, Meisner stated that a commuter train car, traveling along the tracks on the bridge, would be flanked on each side by a girder, permitting only 5½ inches of clearance between the train and the girder to its left or right. On redirect examination, Meisner agreed with the statement that, for all practical purposes, this type of bridge forms "chutes," through which only a railroad train can fit, and that the bridges are designed for no other purpose. On re-cross-examination, he stated that the railroad's bridge record did not indicate that there were warning signs, or any other signs, on the bridge.

Dale Hahne, inspector of police for the Chicago and North Western Transportation Company, testified next. At the time of trial,

Hahne was in charge of the railroad's police operations in Illinois. He first explained the railroad's statutory authority to maintain its own police department in order to supplement the police forces of the various municipalities for the purpose of protecting the railroad's property, employees, passengers and cargo. (Ill. Rev. Stat. 1977, ch. 114, par. 98.) Hahne was then questioned about the railroad's police patrols along its commuter line from Chicago to the city's northwest suburbs, particularly the area around Kedzie and Belmont Avenues and the Avondale Yard. The following colloquy occurred:

"Q. [Railroad's attorney]: What experience in the summer of 1978 did the police force have with trespassers on the commuter lines?

A. We have trespassing situations on all of our commuter lines: adult and juvenile alike. People walk down the tracks, or sometimes juveniles play on the tracks or something like that.

I am not sure if that particular year was any more of a problem than the following or preceding year, but it has always been a consistent concern, yes."

Asked how the railroad's police force attempted to respond to this situation, Hahne explained that, in the Chicago metropolitan area, railroad police officers physically patrolled the railroad's rights-of-way in marked squad cars. He further stated that no consistent pattern or schedule was adhered to because a consistent pattern of police presence would defeat the purpose of the patrols. He testified that railroad police officers became aware of trespassers in a variety of ways: direct observation while on patrol; radio messages from train crews who passed by an area, telephone calls from citizens who observed trespassers on railroad property, and calls from local police who needed to share information or inquire whether the railroad wished to sign a complaint against an individual.

Hahne identified plaintiff's exhibit 21, dated August 3, 1978, as a standard railroad police complaint report. He stated that the report, concerning juveniles on the tracks at Belmont Avenue, was transmitted from a train crew member to a commuter control manager, who informed the railroad police department. A police officer, sent to survey the area where the juveniles had been observed, encountered only an adult trespasser, who was warned and released. Hahne further identified his signature on the report, explaining that he had personally received the telephone call from the commuter control manager, had assigned an officer to investigate, and had received that officer's report of the action taken.

The witness was then asked to describe the "appropriate response" of a railroad police officer who encountered "a child trespasser, a youngster up there [on the tracks]," during the summer of 1978. Hahne testified that his officers confronted any person found on railroad property, but particularly juveniles. They warned juveniles "of the dangers of such actions," and either escorted or directed them off the property. The officer would then prepare an incident report, recording the name, address, and age of the individuals encountered, and the parents' names of a juvenile. The incident report would further serve as a "warning card," which could be consulted in the event of another incident involving the same individual, when the officers might need to determine "whether or not *** to pursue it further criminally."

Hahne further explained that railroad police officers would sometimes take a juvenile home to his parents and advise the parents of the incident. Another option was to send a follow-up letter to the parents at the address given by the juvenile. The letter would "ask the parents' cooperation in monitoring the activities of the children," and would mention that additional incidents might result in "arrest and prosecution for trespassing." Hahne also stated that drawing a gun or discharging one into the air would be an inappropriate response in dealing with a child trespasser and would not be authorized under railroad policy.

During a sidebar, plaintiff's counsel stated that he was prepared to object if the railroad attempted to introduce any incident reports relating to the Avondale Yard area, which was not the location at which plaintiff's decedent was struck by the train or at which he gained access to the tracks. Plaintiff's counsel further stated that there was no indication that appropriately patrolling the Avondale Yard area would equate with patrolling the Irene Avenue area. Counsel for the railroad advised him that he was planning to produce complaint forms "with respect to that entire strip of property, none of which *** w[ould] mention Daniel Colls or any other kids testified to in th[e] case." Plaintiff's counsel immediately moved to exclude all such incident reports from evidence, stating that they had been requested early in the discovery process, but had never been produced. The trial judge, expressing concern with the hearsay nature of such documents as well as with the apparent discovery violation, instructed the C & NW attorney to confine Hahne's testimony to the location and general description of incidents documented in his files. He further ruled that the reports themselves would not be admitted into evidence.

Upon returning to the witness stand, Hahne testified that he had searched the railroad's records relating to alleged incidents of trespassing in 1978, prior to August 19, in the vicinity of the Kedzie Avenue bridge, and had brought these records to court, as well as the records from 1977, 1976, and 1975. Hahne handed the 1978 stack of reports, marked as "C & NW Group Exhibit No.5," to the railroad's attorney, who then presented them to plaintiff's counsel. Plaintiff's counsel voiced his objection, noting that all of the documents in the 1978 stack related to incidents within six months prior to the Colls accident. He stated that plaintiff's case was clearly prejudiced by his having received only one of these reports (plaintiff's exhibit No. 21) during discovery, but none of the others, where plaintiff's complaint alleged the railroad's failure to guard and supervise the area in question. He further stated that had he known of all this evidence tending to show railroad police diligence, he might have employed a different trial strategy. The court declared that there appeared to be an inadequate response to discovery which unfairly prejudiced the plaintiff.

Counsel for C & NW contended that he had been operating under a belief that plaintiff's former attorney had agreed to limit the original document request to a time frame of six months prior to the accident, and that the reports from previous years should therefore be allowed into evidence. However, plaintiff's attorney stated that he knew nothing of such an agreement and that nothing in his files reflected one. Nor could the railroad's counsel locate any evidence in his files to support his contention. Accordingly, the trial judge ruled that none of the additional incident reports would be admitted into evidence. He further ruled that Hahne would not be permitted to testify with respect to those reports, or to be questioned with the stack of reports in front of him. Nor could the railroad use the reports at trial for any purpose. However, Hahne would be allowed to testify as to those incidents which he personally recalled from his many years of railroad police work, including those which he may have recalled after reviewing the excluded documents at some point in the past. Plaintiff's counsel stated his belief that the nondisclosure of these "critical" documents constituted grounds for a mistrial, and so moved. Plaintiff's motion was denied.

On further direct examination, Hahne testified that C & NW property was prioritized as to police coverage, with those areas reporting more incidents of criminal activity receiving more attention by patrols. He stated that the area around Kedzie, Belmont, and the Avondale Yard, the C & NW freight yard adjacent to the Plywood Minnesota building, was referred to as a "hot spot," in comparison to

other areas, because criminal damage to property and theft from freight cars occurred there, in addition to "simple trespass." For these reasons, the area was relatively frequently patrolled. Hahne described the surveillance positions of railroad officers who, in 1978, patrolled the freight yard around the Plywood Minnesota building, "almost on a daily basis in the summertime." From these vantage points, if the officers observed an "adult slinking along" the railroad right-of-way, he would be watched to see if he intended to break into the cars, which often contained large quantities of beer. As for juveniles, police on patrol would "assume [that] they were just trespassers," and would approach and warn them in the routine manner. Hahne also testified that most of the right-of-way in the area was visible and easily accessible to railroad police vehicles traveling on the Kennedy Expressway.

On cross-examination, Hahne estimated that there were approximately 85 C & NW police officers stationed in the Chicago metropolitan area in 1978. Hahne further testified that freight trains would travel through the area either on a daily basis, or several times a day. Commuter trains, which followed a regular schedule, came through hourly in nonrush hours, and more frequently during rush hours. While he described most of the passenger train right-of-way as "approximately 70 mile an hour track," he testified that the freight trains generally traveled more slowly than the commuter trains, and that a freight train might be slowing down even more as it approached this area, in order to exit at the Avondale Yard. Commuter trains, on the other hand, would have no reason to stop or slow down, as there were no commuter stops nearby. Hahne explained that when a train first became visible to someone at this location, the train's headlight would be the first thing to catch the person's attention. At the point where only the headlight was visible, a person could not distinguish an oncoming freight train from an oncoming commuter train. In response to a question from plaintiff's counsel, Hahne agreed that if the officer who investigated the complaints of "juveniles daily" on the tracks had responded to similar reports on other occasions, he would have filled out a complaint form for each incident. On cross-examination by the city's attorney, Hahne further testified that individuals had unrestricted access to the railroad tracks from the Plywood Minnesota parking lot.

At the close of all the evidence, the defendants' motions for a directed verdict were denied. The railroad also moved to strike certain allegations of the plaintiff's complaint, including those which charged the railroad with negligent conduct in (1) failing to properly maintain

the area around the Irene Avenue railroad tracks; (2) failing to maintain guards or other suitable personnel to prevent children from playing on the tracks; and (3) failing to maintain the tracks so as to keep them free of objects attractive to children. Counsel for the railroad argued that these allegations were either vague or duplicative, or were not supported by the applicable law and the evidence in the case. The railroad's motion to strike did not include plaintiff's allegations relating to fencing or the posting of warning signs. Plaintiff's counsel responded, with respect to the allegation of improper maintenance, that the evidence showed that C & NW permitted the retaining wall, which would have provided some sort of barrier to the tracks, to deteriorate. He also objected to the striking of the other above-mentioned allegations, on the ground that they represented remedial steps that could have been taken at slight expense and inconvenience to the railroad, as compared with the risk to the children. Having heard the parties' arguments, the court granted the railroad's motion to strike.

The city then moved to strike every allegation of negligent conduct against it, with the exception of "failure to barricade or fence off" the property. The city maintained that it had no legal duty to perform any of the other acts which it was charged with neglecting. Plaintiff's counsel objected to the striking of those allegations concerning the city's failure to maintain its property. He also argued that, if the city was found to have a duty to fence, it would also have a duty to warn. The trial judge, stating that relevant case law dealt only with a city's duty to fence, sustained the city's motion to strike as presented.

During the jury instructions conference, court and counsel addressed the issue of what the appropriate burden of proof instruction should be, under the facts of the case. Plaintiff and defendant railroad both tendered instructions which were modified versions of Illinois Pattern Jury Instructions, Civil, No. 120.04 (2d ed. 1971) (hereinafter IPI Civil 2d No. 120.04), the official version of which was drafted pursuant to *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836, as a statement of the plaintiff's burden of proof in a negligence case involving a child injured by a dangerous condition on defendant's land. The trial judge decided to use neither of the instructions submitted by counsel. He also determined not to use IPI Civil 2d No. 120.04 in its official, unmodified form, because that instruction includes a paragraph which effectively makes plaintiff's contributory negligence a complete bar to recovery. Instead, the trial judge drafted a court's instruction, more fully discussed below, which he believed modified IPI Civil 2d No. 120.04 so that it more accurately stated Illinois law

following the supreme court's adoption of comparative negligence in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886. Among the other instructions given to the jury were the following: IPI Civil 2d No. A10.03 (Supp. 1986) (explaining contributory negligence as plaintiff's failure to use ordinary care, resulting in a reduction of damages); IPI Civil 2d No. A10.04 (Supp. 1986) (stating the defendant's duty to use ordinary care); IPI Civil 2d No. 10.05 (defining a minor's standard of "ordinary care"); and IPI Civil 2d No. 15.01 (explaining "proximate cause"). Over the railroad's objection, the trial judge refused to instruct on the definition of "trespasser" (IPI Civil 2d No. 120.01), a term appearing in no other instruction that the jury received.

Court and counsel also gave considerable attention to framing an appropriate issues instruction for the jury. The trial judge refused the instruction submitted by plaintiff, which listed certain allegedly negligent acts, such as improper maintenance of the defendants' property and the city's failure to post warning signs, which had been stricken from her complaint. The issues instruction which the jury received, over plaintiff's objection, stated in pertinent part:

"The plaintiff claims that her decedent was fatally injured *** due to one or more of the following instances of wrongful conduct:

1. Defendant [Railroad], in failing to barricade or fence off its elevated railroad tracks.

2. Defendant [Railroad], in failing to maintain warning signs on and around said railroad tracks.

3. Defendant, City of Chicago, in failing to failing to barricade or fence off its property.

The plaintiff further claims that one or more of the foregoing was a proximate cause of decedent's injuries."

Following closing arguments, the jury retired to consider the evidence in light of all the instructions. From their verdict in favor of both defendants, plaintiff now appeals.

OPINION

Plaintiff first contends that the trial court erred in modifying the burden of proof instruction governing the case (IPI Civil 2d No. 120.04), so that the instruction contained an additional element of proof not included in the pattern instruction. She maintains that the use of the court's burden of proof instruction, in combination with the comparative negligence instructions, resulted in a misstatement of the law which needlessly confused the jury and prejudiced her case. In order to adequately address plaintiff's argument, it is necessary to dis-

cuss the relevant provisions of the disputed instructions in relation to the doctrine adopted by our supreme court in *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 126 N.E.2d 836 (hereinafter, the *Kahn* doctrine), and in the context of the applicable standard of review.

The *Kahn* case involved an 11-year-old child injured while playing on a stack of lumber which collapsed. The child was a trespasser on land occupied by a building contractor, where a supplier had piled the lumber without adequate support. The plaintiff's complaint alleged that the lumber and other building equipment were visible to children passing by the property, and that these conditions tended to attract and allure children to the premises. It further alleged that no reasonable precautions had been taken to prevent children from entering the property or to warn them against the dangerously stacked lumber piles. The supreme court held that plaintiff's recovery against both the supplier and the building contractor should stand, despite the general rule that an owner or one in possession or control of premises is under no duty of ordinary care to keep his property in any particular condition for the safety of trespassers or other uninvited entrants. (*Briney v. Illinois Central R.R. Co.* (1948), 401 Ill. 181, 81 N.E.2d 866; *Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 625, 126 N.E.2d 836, 841-42.) However, in analysing the defendants' duty to the trespassing child, the court rejected the use of the "attractive nuisance" label to define an exception to general rule. Rather than recognize the presence of an "attractive" or alluring condition on a defendant's land as providing the basis for the defendant's duty to certain trespassing children (the "attractive nuisance doctrine"), the court noted that the exception was actually grounded in "the customary rules of ordinary negligence cases." (*Kahn*, 5 Ill. 2d at 624, 126 N.E.2d at 841.) The court went on to define the basic elements of the exception as follows:

> "It is recognized, however, that an exception exists where the owner or person in possession knows, or should know, that young children habitually frequent the vicinity of a defective structure or dangerous agency existing on the land, which is likely to cause injury to them because they, by reason of their immaturity, are incapable of appreciating the risk involved, and where the expense or inconvenience of remedying the condition is slight compared to the risk to the children. In such cases there is a duty upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. (*Wagner v. Kepler*, 411 Ill. 368.) The element of at-

traction is significant only in so far as it indicates that the trespass should be anticipated, the true basis of liability being the foreseeabliity of harm to the child." *Kahn*, 5 Ill. 2d at 625, 126 N.E.2d at 842.

The *Kahn* decision, while discarding the older "attractive nuisance" concept as the basis of landowner liability, adopted the view of the Restatement of Torts section 339 (1934). That formulation, with minor revisions, is set out in Restatement (Second) of Torts section 339 (1965), where the following elements of landowner liability for "Artificial Conditions Highly Dangerous to Trespassing Children" are delineated:

"A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) *the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it,* and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children." (Emphasis added.) Restatement (Second) of Torts §339, at 197 (1965).

As indicated by the comment accompanying IPI Civil 2d No. 120.04, that instruction was intended to incorporate the same elements set forth in *Kahn* and in section 339 of the Restatement Second of Torts. IPI Civil 2d No. 120.04 reads as follows:

"Attractive Nuisance—Injury to Children Plaintiff has the burden of proving each of the following propositions:

First: That a condition existed on the [defendant's] premises which the defendant knew, or, in the exercise of ordinary care should have known, involved a reasonably foreseeable risk of harm to children.

Second: That the defendant foresaw, or in the exercise of ordinary care should have foreseen, that children would be likely to go upon [his] [the] premises.

*Third: That the plaintiff was in the exercise of that degree of care which a reasonably careful [minor] [child] of the age, mental capacity and experience of the plaintiff would use under circumstances such as those shown by the evidence.*

Fourth: That the expense or inconvenience to the defendant in remedying the condition would be slight in comparison to the risk of harm to children.

Fifth: That the condition was a proximate cause of the injury or damage to the plaintiff.

If you find from your consideration of all the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff. If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved, then your verdict should be for the defendant." (Emphasis added.) (Illinois Pattern Jury Instructions, Civil, No. 120.04 (2d ed. 1971).)

The comment further notes, consistent with *Kahn*, that "[t]he words 'Attractive Nuisance' were included in the title *** as a useful catch phrase and not to indicate that the instrumentality which causes the injury need have attracted the children onto the premises." IPI Civil 2d No. 120.04, Comment, at 354-55.

■ In attempting to provide the jury, in March 1988, with an accurate instruction on the plaintiff's burden of proof under the *Kahn* doctrine, court and counsel realized that IPI Civil 2d No. 120.04, as set out above, contained a third proposition which effectively required plaintiff to prove the minor's complete freedom from contributory negligence as an essential element of her case. In 1971, when the second edition of the pattern instructions was published, this requirement accurately reflected the law in Illinois, where a plaintiff's own contributory negligence still operated as complete bar to recovery. Ten years later, however, the Illinois Supreme Court judicially adopted comparative negligence in its "pure" form, holding that where a plaintiff is found to have contributed to his own injury by not exercising reasonable care for his safety, his damages "are simply reduced by the percentage of fault attributable to him." (*Alvis v. Ribar* (1981), 85 Ill. 2d 1, 25, 28, 421 N.E.2d 886, 897, 898.) Although the legislature subsequently enacted a statute adopting the "modified" form of comparative negligence for cases where the cause of action accrued on or after November 25, 1986 (Ill. Rev. Stat. 1987, ch. 110, par. 2—116),

the statute has no effect on causes of action, such as the plaintiff's, which accrued prior to that date. Such cases require the application of comparative negligence principles in conformance with the holding of *Alvis*.

As previously noted, plaintiff and defendant railroad suggested different approaches to the problem faced by the court in attempting to use IPI Civil 2d No. 120.04 as the burden of proof instruction. Plaintiff's instruction No. 21, tendered during the instructions conference, tracked the wording of IPI Civil 2d No. 120.04, but entirely deleted the third proposition. In its stead, plaintiff submitted comparative negligence instructions reflecting the *Alvis* principles. The railroad tendered defendant's instruction No. 20, which substantially incorporated the same IPI Civil 2d No. 120.04 elements, but replaced the third proposition with the following:

> "Third: That Daniel Colls did not appreciate that the instrumentality on the premises involved a reasonably foreseeable risk of harm to himself."

The trial judge rejected the railroad's wording of the third proposition as an inaccurate statement of the law. However, he also expressed serious reservations about giving an instruction without any language to incorporate the element of the child's inability to appreciate the risk. He therefore fashioned court's instruction No. 1, which otherwise tracked the official version of IPI Civil 2d No. 120.04, but in place of the third proposition, provided the following:

> "Third: That the condition on the [railroad's] premises is likely to cause injury because of the inability of a child of the age, mental capacity and experience of Daniel Colls to appreciate the risk."

Plaintiff objected, arguing that the court was adding an element of proof not contained in the pattern instruction, a step which was unnecessary because, without the contributory negligence language, the remainder of IPI Civil 2d No. 120.04 fully stated the applicable law.

The underlying premise of plaintiff's foregoing objection may be succinctly stated as follows. The *Kahn* doctrine recognizes that landowners may have a duty to children when they knew or should have known that there was a condition on the premises which involved a reasonably foreseeable risk of harm to children. The element of foreseeablity of risk to the children would not be satisfied in the presence of the children's ability to appreciate that risk. Therefore, according to plaintiff, the "appreciation of risk" element is already contained in the first proposition of IPI Civil 2d No. 120.04. To rephrase it in terms of "appreciation of risk," and incorporate it as a separate, third

element of plaintiff's burden, is not only repetitious but prejudicial, in that it requires plaintiff to "prove the element of foreseeability twice," and places "an undue emphasis" on plaintiff's burden. Plaintiff further suggests that the court erred in fashioning an instruction that placed in issue the inability of Daniel Colls, personally, to appreciate the risk, rather than the "general class of children" who, by reason of their immaturity, might not appreciate the risk. Finally, plaintiff maintains that the full set of jury instructions, by twice including the language of a minor's standard of ordinary care, i.e., "child of the [decedent's] age, mental capacity, and experience," first in the burden of proof instruction and again in the context of comparative negligence, confused the jurors and further prejudiced her case. For reasons which follow, we find no abuse of the trial court's discretion with respect to the burden of proof instruction which it gave.

■■ We begin our analysis with Illinois Supreme Court Rule 239, relating to jury instructions, which states in pertinent part:

"Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." (107 Ill. 2d R. 239(a).)

In interpreting Rule 239(a), the supreme court has observed that pattern instructions, while of great value and importance, are not exempt from challenge, and should be used only where "they accurately state the law applicable in a case." (*Powers v. Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 385, 438 N.E.2d 152, 157.) Where they do correctly and adequately charge the jury, IPI instructions should be used exclusively. (*Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 859, 417 N.E.2d 1099, 1102.) Therefore, the first determination to be made by the trial judge is whether a tendered IPI instruction inaccurately or incompletely states the law under the facts of the case so as to justify modification. (*Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 970, 467 N.E.2d 1045, 1057.) While there are situations in which an IPI instruction is inadequate, any departure from approved IPI instructions deserves careful scrutiny (*Young*, 126 Ill. App. 3d at 970, 467 N.E.2d at 1057), since non-IPI instructions "should be utilized with caution and only where necessary to provide a fair trial" (*Willhite v. Goodman* (1978), 64 Ill. App. 3d 273, 275, 381 N.E.2d 68, 69).

■■ ■ Regardless of whether IPI instructions are utilized, it is well settled that every litigant is entitled to have the jury instructed as to the law governing the case. (*Malek v. Lederle Laboratories*

(1984), 125 Ill. App. 3d 870, 872, 466 N.E.2d 1038, 1039.) Moreover, even if an instruction correctly states the law, it must be sufficiently clear so as not to confuse or mislead the jury. (*Malek*, 125 Ill. App. 3d at 872, 466 N.E.2d at 1039.) Nor should jury instructions unduly emphasize any particular matter. (*Montefusco v. Cecon Construction Co.* (1979), 74 Ill. App. 3d 319, 325, 392 N.E.2d 1103, 1107; *Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 424, 179 N.E.2d 449, 458.) In analysing instructions, they are to be read as a series and considered *in toto*. (*Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 389, 502 N.E.2d 826, 837.) The test is whether, taken as a whole, the instructions are clear enough so as not to mislead and whether they fairly and accurately state the applicable law. (*Friedman*, 151 Ill. App. 3d at 388, 502 N.E.2d at 837.) That the jury might have been instructed in an alternative manner which would have been equally acceptable does not require reversal. (*Zieger v. Manhattan Coffee Co.* (1983), 112 Ill. App. 3d 518, 533, 445 N.E.2d 844, 855.) Reversal for a new trial is required where the trial court erroneously refused an instruction and a party has been prejudiced thereby. *Friedman*, 151 Ill. App. 3d at 389, 502 N.E.2d at 837; *Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 453-54, 374 N.E.2d 1262, 1266.

In support of her position that the trial court's burden of proof instruction inaccurately stated the applicable law and placed undue emphasis on certain aspects of that burden, plaintiff primarily relies on the case of *Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1965), 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd* (1969), 42 Ill. 2d 103, 245 N.E.2d 762. In *Dickeson*, a 14-year-old child attempted to climb aboard a slow-moving train on defendant's right-of-way, only to be knocked off the train by a bridge girder and injured. On appeal following a jury verdict in favor of plaintiff, defendant railroad maintained that the jury was improperly instructed as to the import of the *Kahn* case because IPI Civil No. 120.04 (Illinois Pattern Jury Instructions, Civil, No. 120.04 (1961)), which was given, omits the requirement that the landowner must anticipate that children, because of their immaturity, will fail to appreciate the risk involved. The court discounted the railroad's argument, stating as follows:

> "As to the claim that the instruction left out the requirement that the landowner must anticipate that children, because of their immaturity, will fail to appreciate the risk involved, it is clear that had the jury found that children would have appreciated the risk involved in moving railroad trains, it would have to have found that there was no reasonably foreseeable risk of harm to children. Had the children been able to foresee the

risk, they would not have gone on the trains, and there would have been no reasonably foreseeable harm that could come to them. We feel that the instruction fairly covers all matters included in the *Kahn* doctrine." (*Dickeson,* 73 Ill. App. 2d at 32, 220 N.E.2d at 55-56.)

Of course, *Dickeson* was decided in 1965, before the adoption of comparative negligence. Whatever validity its rationale may have, it upheld use of IPI Civil No. 120.04, in its official, unmodified version, at a time when its third proposition, incorporating contributory negligence language, appropriately reflected the applicable law.

In countering plaintiff's argument, C & NW calls our attention to the more recent case of *Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 502 N.E.2d 826, which involved a 13-year-old girl injured in a sledding accident. In *Friedman,* the plaintiff objected to defendant's tendered burden of proof instruction, which, similarly to the railroad's tendered but refused instruction in the case at bar, dictated that plaintiff must prove that the park district knew of the condition of the premises, realized that it presented an unreasonable risk to "plaintiff," and should have expected that the "plaintiff" would not have appreciated the danger or would fail to protect "herself" against it. The appellate court, noting that plaintiff had provided no supporting authority for her contention, stated:

"We find the instruction to be consistent with the applicable law in this area, and absent authority to the contrary, find plaintiff's argument to be without merit." *Friedman,* 151 Ill. App. 3d at 387, 502 N.E.2d at 836.

The respective arguments of plaintiff and defendant railroad were carefully considered by the trial judge, who expressed reservations about stating defendant's duty in terms of foreseeability of a particular individual being on the railroad tracks. At the same time, he stated that the burden of proof instruction presented a difficult problem because the third proposition should not remain in IPI Civil 2d No. 120.04 after the *Alvis* decision abolishing contributory negligence as a bar to recovery. However, deleting the third proposition meant that certain factors relevant to the jury's consideration of "appreciation of risk" would not be included. Thus, his solution was court's instruction No. 1, with an additional instruction on comparative negligence incorporating the minor's standard of ordinary care.

The difficulty and confusion surrounding the burden of proof issue in this case are entirely understandable. In order to explain some sources of the confusion and our resolution of the question presented, we turn to several commentaries and other scholarly sources which

have addressed various aspects of the "appreciation of risk" factor in context of the "attractive nuisance" doctrine and its modern variants. First, it is evident from our research that, regardless of comparative negligence, the particular child's appreciation of the risk, if established in fact, has consistently been recognized as sufficient to free a defendant landowner of all liability for the child's injuries. As the comment on clause (c) of section 339, Restatement (Second) of Torts, explains:

> "A possessor of land is *** under a duty to exercise reasonable care to keep so much of his land as he knows to be subject to the trespass of young children, free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them. *** The purpose of the duty is to protect children from dangers which they do not appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known and appreciated danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved, but none the less chooses to encounter it out of recklessness or bravado." (Restatement (Second) of Torts §339, comment m, at 204 (1965).)

By way of illustration, the same comment presents the hypothetical situation of two youngsters who venture onto a railroad's land and meddle with an unlocked turntable, resulting in each case with injuries to a foot which gets caught in the turntable. Although the railroad knows that neighborhood children frequently trespass there, and that the turntable involves an unreasonable risk of harm to such children, the railroad is not liable to either child. The first is a boy 16 years of age, "whose maturity and experience make him fully understand and appreciate the danger." The second is a nine-year-old son of a railroad engineer who has been repeatedly warned against the turntable, and so fully appreciates the risk as well. Restatement (Second) of Torts §339, comment m, at 204-05 (1965).

In another major treatise, the importance of the specific child's understanding of the risk is addressed in the following terms:

> "The child, because of his immaturity, either must not discover the condition or must not in fact appreciate the danger involved. Since the principal reason for the rule distinguishing trespassing children from trespassing adults is the inability of

the child to protect himself, *the courts have been quite firm in their insistence that if the child is fully aware of the condition, understands the risk which it carries, and is quite able to avoid it, he stands in no better position than an adult with similar knowledge and understanding.*" (Emphasis added.) (W. Keeton, Prosser & Keeton on Torts §59, at 408 (5th ed. 1984).)

The authors continue by distinguishing the related but distinct concepts of appreciation of the risk and contributory negligence:

"This [full appreciation of the risk] is not merely a matter of contributory negligence or assumption of risk, *but of lack of duty to the child.* Thus the fact that the danger is obvious even to a child, or that the child has been warned about it, may be enough to defeat his recovery, where the child was thereby made fully aware of the situation." (Emphasis added.) W. Keeton, Prosser & Keeton on Torts §59, at 409 (5th ed. 1984).

In addition to the specific child's individual ability to appreciate the risk, if such can be established, another factor that will completely defeat recovery is a condition on the land, which, although known to the occupier, is "not one from which any unreasonable danger to children is reasonably to be anticipated." (W. Keeton, Prosser & Keeton on Torts §59, at 405 (5th ed. 1984).) In other words, there will be no duty to remedy a situation that is not unreasonably dangerous. As phrased in the first proposition of IPI Civil 2d No. 120.04, a plaintiff must prove that a condition existed on the premises that the defendant knew involved "a reasonably foreseeable risk of harm to children." A particularly lucid treatment of this concept appears in an earlier law review article by Dean Prosser, wherein he writes:

"While it is evident that there must be some aggravated danger to the child, greater than the ordinary risks of his daily life, it is equally clear that this cannot be reduced to a formula. Perhaps no better statement of the problem has ever been made than that of the Oklahoma court in *Lone Star Gas Co. v. Parsons*:

'So in these cases we have the question of how uncommon is the instrumentality; how unusually dangerous it is; *** how feasible it is to avoid danger of harm; how great would be the burden of avoiding or lessening danger of harm; and the effect of imposing such duty. And one outstanding inquiry that is often given scant attention by the judge is the apparent intelligence of the child, his intelligent consciousness of the circumstances, *and that he had reached the age where he would not reasonably be expected to tamper because of his*

*appreciation of danger* \*\*\* *so that no duty to protect him could reasonably be imposed.'*

\* \* \*

The last factor mentioned by the Oklahoma court, that of whether the child can reasonably be expected to comprehend the situation, often is of controlling importance in avoiding liability. \*\*\* The question here is not whether he does in fact understand it, although that too has its importance. It is *what the possessor of the land may expect of him.*" (Emphasis added.) Prosser, *Trespassing Children*, 47 Calif. L. Rev. 427, 354-56 (1959), quoting *Lone Star Gas Co. v. Parsons* (1932), 159 Okla. 52, 56, 14 P.2d 369, 373.

Thus, two related but distinct considerations may enter into a determination of landowner liability to a trespassing child: (1) what the defendant may reasonably expect the child to appreciate and understand about the danger presented, considering his age or immaturity; and (2) what the particular child, because of special knowledge, experience, or prior warning, in fact appreciated or understood. A case decided by the supreme court of California is particularly helpful in illustrating the importance of both the minor's age and his actual knowledge in determining whether any duty is owed him. (*O'Keefe v. South End Rowing Club* (1966), 64 Cal. 2d 729, 414 P.2d 830, 51 Cal. Rptr. 534.) In *O'Keefe*, a 15-year-old boy was injured while diving from a pier at a private club's waterfront property, where he was a trespasser. The court, having officially adopted section 339 of the Restatement Second of Torts, proceeded to apply the Restatement factors to the question of whether the youth's claim against the rowing club had been properly dismissed. After pointing out that there was no evidence whatsoever that the club owner knew or had reason to know of children any younger than high school age coming on the property, making teenagers the only trespassers foreseeable, the court discussed the plaintiff's age and experience in terms of appreciation of risk:

"The evidence demonstrates, moreover, that plaintiff had actual knowledge and appreciation of the danger. *The condition of clause (c) of section 339 is fulfilled only when the injured child did not in fact 'realize the risk involved.'* 'The ability to appreciate the danger varies, of course, with the age of the child and *there can be no recovery if the child is of sufficient age and mental capacity to look out for himself under the circumstances presented.* [Citations.]' [Citation.] \*\*\*

The most obvious fact is plaintiff's age. Although we have laid down no definite age limit beyond which the rule of section 339 cannot apply, the age of the child remains an important element in the total picture of each case. *** He was in the second half of his sophomore year in high school, and was receiving passing grades in all his courses. ***

\* \* \*

Nor was plaintiff a novice in the arts of swimming and diving. He had been swimming for some three or four years prior to the accident, and had received swimming and diving lessons in high school. ***

Finally, plaintiff's knowledge of the actual diving conditions at defendant's pier was extensive. *** Plaintiff agreed that he 'knew' that the depth of the water was 'somewhere between five and six feet' ***.

\* \* \*

*** 'In the light of the undisputed facts now before us, there is no sound basis for concluding that the condition which caused plaintiff's injury should have been recognized as constituting an unreasonably great risk of serious bodily harm which plaintiff was unable to discover or appreciate *because of [his] immaturity.*' [Citation.] It follows that no special duty toward plaintiff arose by virtue of defendant's ownership of the property." (Emphasis added.) *O'Keefe*, 64 Cal. 2d at 743, 744, 745-46, 414 P.2d at 839, 840, 841, 51 Cal. Rptr. at 543, 544, 545.

More recently, in *McDonald v. Consolidated Rail Corp.* (1987), 399 Mass. 25, 502 N.E.2d 521, the highest court of Massachusetts addressed a question substantially similar to that raised by plaintiff with respect to a court-drafted burden of proof instruction and its "appreciation of risk" elements. On appeal from a jury verdict for the defendant railroad, a 16-year-old plaintiff struck and injured by a freight train on a girded railroad trestle challenged the trial court's refusal of his tendered jury instruction, which read:

" 'In addition to the duty of the railroad created by statute, the Commonwealth of Massachusetts also places a common law duty of reasonable care by the Defendant to prevent harm to foreseeable child trespassers. *Soule v. Massachusetts Electric Company,* 378 Mass. 177[, 390 N.E.2d 716] *** (1979).' " (399 Mass. at 28, 502 N.E.2d at 524.)

The trial judge's instruction, by contrast, "repeatedly emphasized that the duty arises at common law only where the jury find the additional fact that the plaintiff was 'too young to appreciate the risk and dan-

ger involved,' or that he 'lacked the understanding to evaluate the peril.' " (*McDonald*, 399 Mass. at 28, 502 N.E.2d at 524.) The reviewing court's rationale in resolving the issue against McDonald is instructive, especially in light of plaintiff's argument that defendants' duty to Daniel Colls would be established by their knowledge of conditions on the land presenting an unreasonable risk of harm to children, generally, or to a general class of children who might be incapable of appreciating the risk. The court explained:

"A careful reading of *Soule* makes it clear that the duty of reasonable care owed by a landowner to a child trespasser is applicable only where *a plaintiff* would fail to appreciate his peril because of *his youth.* \*\*\* [O]ur decision in *Soule* is read properly to recognize a common law rule that is indistinguishable in its elements from [our] statute or from its twin, §339 of the Restatement (Second) of Torts. Both the Restatement §339 and the statute, when read in light of our decision in *Schofield v. Merrill, supra,* yield the result that no duty of reasonable care is owed to foreseeable child trespassers unless they are shown to have been persons who 'because of their youth do not discover the condition or realize the risk involved.' " (Emphasis added.) *McDonald*, 399 Mass. at 29, 502 N.E.2d at 524.

However, every jurisdiction has not applied the doctrine of section 339 in exactly the same manner. Another commentator, discussing the treatment of child trespassing cases in the various jurisdictions, explained the differing ways in which questions determinative of a defendant's liability can be presented to the trier of fact, as follows:

"[C]ases considering the effect of the child's age and mentality upon the application of the doctrine have been concerned primarily with either or both of the following crucial questions: (1) whether in view of the child's age and mentality, or presumed mentality, the dangerous condition or hazard to which the child was exposed was one which the child should have understood or appreciated and, therefore, protected himself against, or, in other words, whether the danger or hazard was one which the defendant reasonably could have expected the child would perceive, appreciate, and avoid, and (2) whether the child, in view of his age and mentality and the other facts and circumstances of the case, did in fact understand or appreciate the danger but nevertheless exposed himself to it.

In some of the cases the problem of the child's presumed or actual perception and appreciation of the danger has been regarded as bearing upon, or at least discussed in terms of, the

existence, scope, and breach of the defendant's duty to the child.

In other cases, the same or substantially similar problem as to the child's perception of the danger is regarded as bearing upon, or discussed in terms of, the child's own contributory fault." Annot., 16 A.L.R.3d 55 (1967).

Clearly, the "appreciation of risk" factor was presented to jurors in Illinois, by means of IPI Civil 2d No. 120.04, in terms of contributory fault. As with any of the other elements in the instruction, a finding against the plaintiff, that the child was contributorily negligent, would totally bar any recovery. In other words, such a finding would preclude, if not the application of the *Kahn* doctrine or a duty to the child, then at least any finding of liability to that child on the part of the landowner. As the same commentator further explained:

"For example, it is possible to argue or reason that where the hazard or danger was one which the child should, or in fact actually did, understand or appreciate, then the defendant owed no duty to the child to protect him against the danger and could not be held liable for a breach of duty (that is, negligence).

Somewhat similarly, *at least insofar as the ultimate result is concerned*, it also may be reasoned or argued that since the danger or hazard was one which the child should, or actually did, understand or appreciate, the child was 'contributorily negligent' or 'assumed the risk' in exposing himself to it, and, therefore, *the defendant could not be held liable*." (Emphasis added.) Annot., 16 A.L.R.3d 56 (1967).

Speaking particularly of jurisdictions which have accepted or have followed section 339 of the Restatement, he goes on to explain:

"Under the rule of [section 339], the duty which the land possessor owes to trespassing children is phrased objectively in terms of his duty to children as a class, and *where the other requirements of the rule are met*, it is said that the possessor may be held liable for exposing 'children' who 'because of their youth do not discover the condition or realize the risk involved' to an 'unreasonable risk' of harm. *** [A]s explained in the comments [to section 339], the rule of [the section], seems to be inclusive of both an objective test as to whether the danger was one which a child of the age and mentality involved should have perceived, and also of a subjective test as to whether the danger was in fact perceived by the particular child. The revised comments to Restatement, Torts 2d §339, make it clear that

the rule is inapplicable both to dangers which children 'should' or 'can be expected to' observe and appreciate, and to dangers which are in fact fully appreciated by the particular child involved." (Emphasis added.) Annot., 16 A.L.R.3d 57-58 (1967).

We next consider how the Illinois courts, specifically, have interpreted and applied the *Kahn* principles. Initially, we note that our supreme court has expressly stated that the *Kahn* decision "brought Illinois law into harmony with section 339 of the Restatement (Second) of Torts." *Corcoran v. Village of Libertyville* (1978), 73 Ill. 2d 316, 326, 383 N.E.2d 177, 180.

Like those in many other jurisdictions, courts in this State have determined that certain dangers, such as fire, water, or falling from a height, pose risks which are "obvious," and thus assumed to be fully appreciated by any child of an age to be allowed at large. (See *Corcoran*, 73 Ill. 2d at 327, 383 N.E.2d at 180; *Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 400, 502 N.E.2d 846, 848.) As a matter of law, a landowner has no duty to remedy such conditions or protect against such dangers. Plaintiff relies on two supreme court cases involving such "obvious dangers" to support her contention that the applicable law on plaintiff's burden of proof was fully stated in IPI Civil 2d No. 120.04, absent its third proposition.

In *Corcoran*, the court upheld an appellate decision dismissing the plaintiff's complaint against the village and Lake County for negligence allegedly causing severe injuries to a two-year-old child who fell into a ditch in a neighborhood park. In the context of its holding, the court discussed a landowner's duty under the *Kahn* doctrine as follows:

"Under *Kahn*, a duty which would not be imposed in ordinary negligence will be imposed upon the owner or occupier of land only if such person knows or should know that children frequent the premises *and* if the cause of the child's injury was a *dangerous* condition on the premises. If both of these prerequisites are met, it is deemed that harm to children is sufficiently foreseeable for the law to impel an owner or occupier of land to remedy the condition.

As *Kahn* sets forth, a dangerous condition is not that which creates an unreasonable risk of harm to the general class of persons who might frequent the premises. It is one which is likely to cause injury to the *general class of children* who, by reason of their immaturity, might be incapable of appreciating the risk involved." (Emphasis in last paragraph added; other

emphasis in original.) (*Corcoran*, 73 Ill. 2d at 326, 383 N.E.2d at 180.)

The court went on to explain that unless a defendant has reason to know that children of very tender age are likely to roam unattended on the premises, the law will impose a duty only to remedy conditions which are dangerous to children generally, *i.e.*, to those old enough to roam unattended. Because the plaintiff's complaint had alleged defendants' knowledge of children frequenting the premises, but not children of Matthew Corcoran's tender age, specifically, the complaint would only state a cause of action if it could be determined that the ditch was dangerous to children generally. (*Corcoran*, 73 Ill. 2d at 327, 383 N.E.2d at 180.) Having decided that the ditch in question would expose children to risks no greater than those which they would generally be expected to recognize and appreciate, the court found that plaintiff had not stated a cause of action and that her complaint should have been dismissed.

While *Corcoran* provides that a defendant's duty will be established where a plaintiff proves that the child's injury was caused by a condition dangerous to those children who are old enough to be out and about unattended and who foreseeably wander onto his premises, and will not be established where the dangerousness of the condition is obvious to such children, the opinion does not deal specifically with what factors will preclude liability even if such a duty can be initially established. It was evident that the plaintiff in *Corcoran* would be unable to establish the elements of the *Kahn* doctrine under any set of facts presented at trial, and therefore, the lawsuit was appropriately dismissed on the basis of the pleadings. Moreover, there was no basis for any discussion in *Corcoran* of the child's appreciation of the risk, or his contributory negligence, or jury instructions. Finally, we note that *Corcoran* was decided several years before the *Alvis* decision adopting comparative negligence. At that time, even if a plaintiff could prove foreseeability and establish that the cost and inconvenience of remedying the situation was minimal, a finding that the particular child was at all contributorily negligent would result in a judgment for defendants because, consistent with IPI Civil 2d No. 120.04, a trier of fact could not find them liable. Thus, while it is clear that the parameters of a defendant's duty under the *Kahn* doctrine in Illinois, as explained in *Corcoran*, would not be the same as those set forth by the Massachusetts court in the passages from the *McDonald* case which we have quoted, it is questionable whether the *Kahn* doctrine would remain in harmony with section 339, including clause (c) of that section, where the application of pure comparative negligence,

as opposed to a finding of traditional contributory negligence as an absolute bar, permitted a sizable recovery to a plaintiff who was of an age and experience to have fully appreciated the risk, or who did, in fact, appreciate the risk, but may have been somewhat at fault due to carelessness or inattention.

Six years after *Corcoran*, the supreme court decided another case involving what the majority determined to an "obvious" hazard on defendants' property. (*Cope v. Doe* (1984), 102 Ill. 2d 278, 464 N.E.2d 1023.) In *Cope*, the court affirmed an order of the appellate court, holding that the defendants were entitled to a judgment *n.o.v.* because they owed no duty to plaintiff's decedent as a matter of law. The jury had returned a verdict in favor of the plaintiff, whose seven-year-old son had drowned in 1977 after falling through the ice partially covering a retention pond at their apartment complex. The jury had also answered special interrogatories finding the plaintiff and his father not guilty of contributory negligence. At the time of the accident, the pond was approximately one-third covered with ice, which broke under the child when he and two friends wandered out on it. It was established at trial that the defendant developers were well aware that young children played and fished at the pond, which, unlike the playground on the premises, had not been designed for recreational use. The court restated the *Corcoran* definition of dangerous condition as "one which is likely to cause injury to *children generally* who, by reason of their age and immaturity, would not be expected to comprehend and avoid the attendant risks." (Emphasis added.) (*Cope*, 102 Ill. 2d at 286, 464 N.E.2d at 1027.) It then concluded that the retention pond was not a "dangerous condition" as defined in *Corcoran* because it posed only the danger of an ordinary body of water, a danger which any child could be expected to appreciate and avoid. *Cope*, 102 Ill. 2d at 289, 464 N.E.2d at 1028.

Interestingly, however, the majority opinion in *Cope* concludes by referring to defendants' duty in terms of the individual child's appreciation of the risk:

> "The [partially frozen retention] pond was an ordinary body of water which, as any other, presented the risk of drowning. We cannot say that it presented perils that were not appreciated by plaintiff's decedent. Accordingly, we hold that the defendants owed no duty to plaintiff's decedent as a matter of law." (*Cope*, 102 Ill. 2d at 289, 464 N.E.2d at 1028.)

Also noteworthy is the following language chosen by Justice Clark, who, with Justices Goldenhersh and Simon, dissented from the majority opinion on grounds that testimony about the particular character-

istics of the pond precluded the entry of judgment *n.o.v.* for the defendants:

> "I cannot agree with the majority of this court that the defendants in the case at bar owed no duty to plaintiff's decedent *as a matter of law*. I believe that the questions of whether the retention pond was characterized by the developer as a 'recreational facility,' whether the retention pond was an 'ordinary body of water,' *whether plaintiff's decedent appreciated the perils the water presented*, and whether the retention pond created a reasonably foreseeable risk of harm (the test for assessing liability), were all matters for determination by the jury.
>
> * * *
>
> I do not agree that a seven-year-old can appreciate the fact that water that is partially frozen actually creates a *greater* risk of drowning * * *. It may be apparent that if you step off the edge of a ditch you will fall in the hole. I do not think it is as obvious that if you stand on the frozen edge of a pond you will drown. In any event, * * * these issues were factual determinations to be made by the jury * * *." (First and third emphasis in original; other emphasis added.) (*Cope*, 102 Ill. 2d at 289-90, 293, 464 N.E.2d at 1028-29, 1030 (Clark, J., dissenting, joined by Goldenhersh and Simon, JJ.).)

Justice Simon, adding a separate dissent, joined by Justice Clark, further observed:

> "In the last paragraph of its opinion the majority states that it 'cannot say that it [the retention pond] presented perils that were not appreciated by plaintiff's decedent.' [Citation.] Here the appellate court ordered the entry of a judgment *n.o.v.*, but the court's conclusion does not satisfy the strict standard for granting a defendant a judgment *n.o.v.* announced in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510. That case directs that a defendant is entitled to a judgment notwithstanding the verdict when the evidence viewed in its aspects most favorable to the plaintiff so overwhelmingly favors the defendant that no verdict could ever stand. * * * I believe that to satisfy the *Pedrick* standard, it is necessary for the majority to say affirmatively *either that the retention pond presented no perils or dangers to a seven-year-old boy or that, if it did present such perils or dangers, they were fully appreciated by plaintiff's decedent*." (Emphasis added.) *Cope*, 102 Ill. 2d at 293-94, 464 N.E.2d at 1031 (Simon, J., dissenting, joined by Clark, J.).

Our research reveals that numerous Illinois appellate decisions include language and reasoning supportive of the trial court's decision to incorporate an appreciation-of-risk proposition framed in terms of the injured child's age and experience. For example, in *Warchol v. City of Chicago* (1979), 75 Ill. App. 3d 289, 393 N.E.2d 725, where a 15-year-old plaintiff brought a negligence action to recover for injuries sustained while walking on top of a fence, the court first observed that the plaintiff's age alone would not prevent the *Kahn* principles from applying. The court then continued:

> "For liability to be imposed upon an owner or occupier of land under the rule in *Kahn*, the child must be of such an age and experience as to be incapable of appreciating the danger involved in his or her activities. *Therefore, no action may be maintained if children of a similar age and experience as the plaintiff are capable of understanding the danger involved.* (See *Sahara v. Ragnar Benson, Inc.* (1977), 52 Ill. App. 3d 119, 367 N.E.2d 233; *Merkousko v. Janik* (1973), 14 Ill. App. 3d 343, 302 N.E.2d 390.) We believe that the plaintiff was of sufficient age and experience to appreciate the danger involved ***. We, therefore, conclude that count II was properly dismissed against the City." (Emphasis added.) *Warchol*, 75 Ill. App. 3d at 296, 393 N.E.2d at 731.

In *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 453 N.E.2d 1133, the court first found that a tree stump with a tendency to roll was not a condition that posed any greater risk to children generally than those to which they are exposed in their everyday lives. It therefore held that entry of summary judgment was proper against a 14-year-old plaintiff who stood on the log and fell off, because the condition was not a "dangerous" one, as defined in *Corcoran*, and therefore no duty was owed to plaintiff. However, the court continued, as follows:

> "While the absence of a dangerous condition is alone fatal to a [*Kahn*] cause of action, we proceed nonetheless to an analysis of plaintiff's contention regarding the third element of the *Kahn* test. Plaintiff emphasizes several facts from the record to support her position that she was unable to perceive the risk of standing on the log. Plaintiff alludes to the fact that she contracted spinal meningitis as a child and as a consequence, was forced to stay out of school for two years. Plaintiff fails, however, to show how her previous illness affected her ability to perceive the risk of standing on the log. *** Thus, her prior medical condition is irrelevant to the determination whether she could perceive the risk involved in standing on the stump.

In addition \*\*\*, plaintiff also argues that her testimony indicates she had no familiarity with logs, had never stood on one or on a similarly round object, and was unaware that a log could roll. This fact, plaintiff argues, in combination with the testimony of defendant and his wife that they had admonished children in the past not to play on the logs \*\*\* demonstrates that a material fact exists whether plaintiff appreciated the risk.

The court in *Kahn* stated that liability exists when young children because of their immaturity are incapable of appreciating the risk attending the dangerous agency. [Citations.] This test is objective for it does not focus on the specific plaintiff's appreciation of risk, but rather on the *risk appreciated by young children of a similar age and experience.* [Citations.] \*\*\* [W]hile plaintiff testified she didn't appreciate the risk, we conclude as a matter of law that no similarly situated child could fail to appreciate the risk of standing on the log." (Emphasis added.) *Fuller*, 117 Ill. App. 3d at 941-42, 453 N.E.2d at 1138-39.

Two other appellate cases illustrate the courts' perception that the "obvious dangers" rule of *Corcoran* and *Cope* coexists with a separate objective test for the particular child's appreciation of the risk. In *Durham v. Forest Preserve District* (1986), 152 Ill. App. 3d 472, 504 N.E.2d 899, this court stated:

"In the instant case, the drowning occurred in an ordinary pond as it did in *Cope, Weber*, and *Prince.* \*\*\*

Durham was 16 years of age and thus older than any of the children in *Cope* (7 years), *Weber* (9 years old), or *Prince* (15 years old). Regarding age, appreciating the risk is an objective test which focuses on children of similar age and experience. [Citation.] Moreover, 'any child of age to be allowed at large,' is expected to appreciate an obvious and open danger. [Citations.]" (*Durham*, 152 Ill. App. 3d at 477, 504 N.E.2d at 902.)

Sometimes appellate opinions have expressed the appreciation of risk factor in terms of precluding duty, rather than in terms of precluding liability or recovery, a posture which appears to conflict with the concept of duty as delineated in *Corcoran*, while at the same time reiterating the "obvious risks" rule in terms of lack of duty to children, generally. As this court recently stated:

"A landowner owes no duty to a child if children of a similar age and experience would be able to appreciate the dangers on the premises. [Citations.] There is no duty on the part of a

landowner to remedy obvious risks which children know or should know are present, because they are expected to avoid dangers which are obvious and therefore no reasonably foreseeable risk of harm exists. [Citations.]" (*Salinas v. Chicago Park District* (1989), 189 Ill. App. 3d 55, 61, 545 N.E.2d 184, 187.) Finally, we note that several other cases also support the premise that there can be no recovery if children of a similar age and experience as the plaintiff are capable of understanding the danger involved. See, *e.g., Newby v. Lake Zurich Community Unit, District 95* (1985), 136 Ill. App. 3d 92, 98, 482 N.E.2d 1061, 1066; *Sydenstricker v. Chicago & Northwestern Ry. Co.* (1969), 107 Ill. App. 2d 427, 433, 247 N.E.2d 15, 18.

■■ In light of the above-cited authority, the basis of the confusion attending the framing of the issues instruction in this case is readily apparent. Our supreme court in *Corcoran* has stated that a duty exists whenever there is a defendant's knowledge that children trespass on his land, combined with a dangerous condition on that land, "dangerous condition" being defined in terms of all children, who, as a general class, are old enough to be playing there unattended. However, that same court has stated that Illinois law is in harmony with section 339, which has consistently been interpreted as precluding recovery by a plaintiff of an age and experience to have personally appreciated the risk involved, or who in fact did appreciate it. We further observe that section 339 itself has always contained a separate proposition focusing solely on the children's failure to appreciate the risk because of their youth, as distinct from either notice to the defendant of trespassing children or the dangerousness of the condition. (Restatement of Torts §339 (1934); Restatement (Second) of Torts §339 (1965).) While prior to the adoption of comparative negligence, the third proposition of IPI Civil 2d No. 120.04 served a somewhat similar purpose in focusing the jury's attention on the minor's perception of the danger confronting him, albeit in a contributory fault context, it also functioned to preclude recovery absolutely, as would absence of duty or recovery otherwise precluded by the child's presumed or actual appreciation of the risk. The third proposition of court's instruction No. 1 was intended by the trial judge to provide for a focused consideration of the child's appreciation of the risk in a manner similar to that provided by clause (c) of section 339. In light of the above authority, we cannot find that his decision to replace the third proposition of IPI Civil 2d No. 120.04 with an "appreciation of risk" clause was error.

■ We do believe, however, that the trial court should not have framed the third proposition in terms of the "condition on [the railroad's] premises" being likely to cause injury, rather than focusing directly on the child's appreciation of the risk. As *Cocoran* holds, the "dangerousness" of the condition, as such, is to be determined by reference to the class of children, generally, who by reason of their immaturity would be unable to appreciate the risk. (But see *Trobiani v. Racienda* (1968), 95 Ill. App. 2d 228, 233, 238 N.E.2d 177, 179 (which approached the element of the child's appreciation of the risk in a manner similar to that of the trial court in this case, holding that to impose liability under *Kahn*, the plaintiff must show, *inter alia*, that there is a defective structure or dangerous agency on the land, and that such "structure or agency is likely to cause injury because of *the child's* inability to appreciate the risk." (Emphasis added)).) Nonetheless, we do not find that this mistake in language could have prejudiced plaintiff, where the railroad's attorney expressly conceded that the train was a dangerous instrumentality and where the lengthy and highly credible testimony of the railroad's witnesses overwhelmingly established that the railroad viewed the condition on its property as very dangerous and a threat to the safety of children in general.

■ Our one other reservation regarding the language of the court's instruction is its use of the term "mental capacity," in addition to "age" and "experience." In a recent case involving an eight-year-old mentally handicapped child injured on a park slide, this court held that the landowner's duty would be based on an inability of children of a similar age and experience to appreciate the risk, not on the handicapped child's more limited ability to do so. Otherwise, an undue burden would be placed on landowners, who would be required to focus on a minor's subjective inability to appreciate the risk. (*Salinas v. Chicago Park District* (1989), 189 Ill. App. 3d 55, 61, 545 N.E.2d 184, 187.) In other words, although it is proper to consider the minor's actual knowledge where the child has some greater understanding than a typical child of his age (*Hagy v. McHenry County Conservation District* (1989), 190 Ill. App. 3d 833, 840, 546 N.E.2d 77, 82; *Swearingen v. Korfist* (1989), 181 Ill. App. 3d 357, 362-63, 537 N.E.2d 365, 368), defendants are not expected to foresee the unique mental and physical limitations of a particular minor in terms of ability to appreciate the risk. However, we also consider any slight misstatement of law in this choice of language to be nonprejudicial under the facts of the instant case. The evidence established that the class of children similar to Daniel Colls in age and experience would generally correspond to those similar to him in age, mental capacity, and experience. Further-

more, if testimony that Daniel had repeated one grade in school was in fact considered by the jury in determining defendants' liability, it could only have weighed as a factor in plaintiff's favor. Therefore, any error in framing the precise language of the third proposition must be deemed harmless.

■ Nor do we find that the trial court erred in giving both court's instruction No. 1 and the comparative negligence instructions, including the definition of a minor's standard of ordinary care, *i.e.*, "that degree of care which a reasonably careful child of the age, mental capacity, and experience of the decedent would use" under similar circumstances (IPI Civil 2d No. 10.05 (1981)). First, we do not believe that the average juror would be confused as to the meaning and function of the "appreciation of risk" and the contributory negligence instructions, despite some shared language. The third proposition in the court's burden of proof instruction is concerned with whether there is a reasonably foreseeable risk of harm to children such as plaintiff's decedent because children of his age and experience are unable to appreciate the risk, *i.e.*, cannot be presumed to understand and fully appreciate the dangers on the premises. The contributory negligence instruction, on the other hand, focuses directly on Daniel Colls and his actions prior to and at the time he encountered a fast-moving train on the railroad's bridge at Kedzie Avenue on August 19, 1978. It essentially asks whether Daniel Colls was as careful as one could reasonably expect someone of his age, mental capacity, and experience to be under those particular circumstances, or whether his own recklessness or inattention in encountering the dangerous condition on the railroad's right-of-way was partially to blame for the specific injuries which he sustained. In other words, it gives the jury the opportunity to determine the extent to which he personally, as well as one or both defendants, may have been at fault. To that extent, even if he or children like him could not be expected to fully appreciate the risk involved, and plaintiff had proved all of the other propositions in the burden of proof instruction, his recovery would be reduced.

Moreover, the jury instructions, when viewed as a set, convey the clear impression that the jurors were to find the defendants liable for any amount of damages if, and only if, plaintiff proved each of the separate propositions in court's instruction No. 1. Furthermore, they expressly state that the total amount of damages to which plaintiff would "otherwise be entitled" was to be reduced in proportion to the amount of contributory negligence, *i.e.*, the degree to which Daniel Colls, before and at the time of the occurrence, failed to use ordinary care for his own safety. Thus, the distinction between a typical 12-

year-old child's inability to appreciate the hazards of the defendants' premises, and the failure of decedent to exercise ordinary care for his own safety under the circumstances, should have been sufficiently clear to the jurors.

Finally, there is substantial precedent favoring the jurors' separate consideration of these issues, under separate instructions. For example, the supreme court of Oregon, discussing the role of contributory negligence instructions in a child trespassing case, stated as follows:

> "There is, therefore, no disharmony in permitting the jury to find first that defendant was negligent as determined by [the Restatement of Torts section 339] tests \*\*\*, and yet find that the particular child injured had, because of his own fault, forfeited his right to recover. \*\*\*
>
> \* \* \*
>
> There is ample authority for the position we have taken. In 2 Harper and James, §27.5 \*\*\* it is said:
>
> \* \* \*
>
> 'The question of the child's contributory negligence is a separate problem which must be carefully distinguished from that of the land occupier's duty \*\*\*. Unfortunately the issues are often confused. See note 54, supra. Where contributory negligence bars recovery anyway, the confusion does not affect the result. But in cases in which the plaintiff may not be contributorily negligent, it would be important to keep the issues distinct.' " *Pocholec v. Giustina* (1960), 224 Or. 245, 254-55, 355 P.2d 1104, 1108-09, quoting 2 F. Harper & F. James, Torts §27.5, n. 57, at 1455 (1956).

Furthermore, a relatively recent case from this district of the Illinois Appellate Court supports the premise that the comparative negligence instruction performs a separate and distinct role from an appreciation of risk determination by the jury, and that the defendant's liability, and the child's presumed inability to appreciate the risk, are not dispositive of the jury's finding relating to contributory fault. In *La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 478 N.E.2d 417, IPI Civil 2d No. 120.04, was not tendered by either party, was not used, and was not at issue on appeal. However, we find instructive the court's approach to the issue of whether a jury finding of some contributory negligence on the child's part also established, by implication, that he must have appreciated the risk. The court reasoned as follows:

"City next contends that plaintiff's appreciation of the danger associated with 'flipping' moving railroad trains precludes the application of *Kahn. A prerequisite for the imposition of liability under Kahn* is that the minor plaintiff be found to be 'incapable of appreciating the risk involved' by reason of his immaturity. [Citation.] City cites *Sydenstricker v. Chicago & Northwestern Ry. Co.* [citation], for the proposition that where a child is capable of appreciating the risk involved in a particular activity, the application of *Kahn* is inappropriate. According to defendant the jury's finding that plaintiff was 18% at fault 'conclusively determined that plaintiff was able to and did, in fact, appreciate the risk involved in attempting to jump on a moving freight train.'

Plaintiff responds that in *Alvis v. Ribar* [citation], our supreme court adopted the 'pure' form of comparative negligence and specifically rejected the previous Illinois law which held that *any degree* of contributory negligence by the plaintiff should bar his recovery. Here, the jury made no specific finding that plaintiff 'appreciated the risk' in jumping on a moving freight train. It merely found that plaintiff was 18% at fault. We cannot conclude from such verdict that 'plaintiff actually appreciated the danger of flipping railroad cars' within the context of *Kahn* and *Sydenstricker.*" (First emphasis added; other emphasis in original.) *La Salle*, 132 Ill. App. 3d at 615, 478 N.E.2d at 422.

Our research has also revealed one case where the "record relating to plaintiff's age, mental capacity, intelligence and experience" was found to raise "a material question as to whether plaintiff was capable of appreciating the risk," so as to require the issue of his contributory negligence to be submitted to the jury. (See *Pellegrini v. Chicago, Rock Island & Pacific R.R. Co.* (1980), 91 Ill. App. 3d 1091, 1093, 415 N.E.2d 615, 617.) Of course, *Pellegrini* was decided before the adoption of comparative negligence, and any overlap between the two concepts in the juror's minds would have have been inconsequential. The result in either case would have been preclusion of any recovery by the plaintiff. Finally, we note that a recent Illinois decision, concerning a negligence suit brought by a 15-year-old injured on defendant's premises, held that failure to give the same comparative negligence instructions as were given here, when some evidence supporting an inference of the child's contributory negligence was before the jury, was reversible error. (*Leonard v. Pitstick Dairy Lake & Park, Inc.* (1990), 202 Ill. App. 3d 817, 824-25, 560 N.E.2d 467, 472.)

For all of these reasons, we find that the burden of proof and comparative negligence instructions, as independently considered by the jurors, accurately stated the applicable law without causing confusion or placing undue emphasis on any particular matter.

In summary, we find that the trial judge used sound discretion in dealing with a challenging set of issues related to plaintiff's burden of proof. First, it was beyond dispute that IPI Civil 2d No. 120.04 could not be given in its official, unmodified form, and that a revised version of the instruction had not been published.[1] Thus, modification of IPI Civil 2d No. 120.04 was justified. Secondly, the instruction tendered by defendant railroad, while premised on a valid legal principle, that there can be no liability to a minor who, in fact, appreciated the risk, was also inappropriate. The railroad's instruction contained a third proposition framed in terms of Daniel Colls' appreciation of foreseeability, i.e., his appreciation that the train involved a "reasonably foreseeable risk of harm" to him. Thus, the instruction was properly refused as a misstatement of law. Furthermore, plaintiff's instruction, while eliminating the contributory negligence element from IPI Civil 2d No. 120.04, raised some concern that no language focusing the jury's attention squarely on the minor's appreciation of risk would appear in the instruction. In light of the substantial authority discussed herein, we believe that this concern was legitimate and was appropriately addressed by court's instruction No. 1.

In any event, it is apparent from the variety and nuances of language used by Illinois and other courts in construing the applicable law that the trial judge in the case at bar was presented with no clear-cut guide to framing the perfect set of jury instructions. The question before us is not whether plaintiff's solution, or any other, might have been an equally acceptable alternative to that devised by the court. The issue is whether the burden of proof and comparative negligence instructions, read in sequence, were a fair and accurate statement of the law, sufficiently clear so as not to confuse or mislead the jurors. We believe that this standard was met, without prejudice to plaintiff's case. We therefore find no error.

---

[1]We have been informed that a revision of IPI Civil 2d No. 120.04 is due to be released for publication in the near future. It is likely that the revised pattern instruction may not be entirely consistent with the court's instruction as given. Nonetheless, under the facts and circumstances of this case, we believe that our holding is amply supported by the weight of authority and is the proper determination under the applicable standard of review.

Plaintiff next objects to the trial court's handling of discovery violations by the railroad. Plaintiff contends that the trial judge abused his discretion and committed reversible error by denying her motion for a mistrial following the late disclosure of police incident reports during Inspector Hahne's testimony. She further claims that the court erred in permitting Hahne to give further testimony regarding police activities in the immediate area of the accident, after the reports themselves had been barred. Plaintiff argues that the court's sanction, which was to exclude the reports from evidence and from any use at trial, was totally inadequate under the circumstances. She claims that the nondisclosure of these documents deprived her of critical information concerning the railroad's knowledge and its response to complaints about children on its right-of-way. It is plaintiff's view that only the granting of a mistrial could have overcome the prejudice to her case which resulted from not having an opportunity to examine and investigate these reports, and to take them into consideration in developing a trial strategy.

■■ Supreme Court Rule 219 vests the trial judge with great power in authorizing the court to enter "such orders as are just" if a party fails to comply with discovery procedures. (107 Ill. 2d R. 219(c).) It is well settled that the decision to employ sanctions, and what sanctions to use, are matters within the broad discretion of the trial court, and that absent a clear abuse of discretion, a reviewing court will uphold the trial court's decision. (*Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 459 N.E.2d 940; *Harris v. Harris* (1990), 196 Ill. App. 3d 815, 555 N.E.2d 10; *In re Henry* (1988), 175 Ill. App. 3d 778, 530 N.E.2d 571; *King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 513 N.E.2d 958; *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232; *Ferenbach v. DeSyllas* (1977), 45 Ill. App. 3d 599, 359 N.E.2d 1214.) As this court has stated, our role is not to second-guess the trial court's decision; our sole function on appeal is to determine whether the trial judge abused his discretion. (*Hengels v. Gilski* (1984), 127 Ill. App. 3d 894, 906, 469 N.E.2d 708, 718.) Under the particular facts and circumstances of the case at bar, we cannot say that such an abuse was apparent.

■■ There is no question that the trial court was justified in imposing sanctions on the railroad for its nondisclosure of 30 relevant incident reports from the 3½-year period prior to August 19, 1978. The documents at issue were well within the scope of plaintiff's interrogatories, and also within the scope of plaintiff's request to produce, both filed eight years before the trial commenced. There is nothing in the record to indicate that these documents were not as readily acces-

sible to defendant railroad during the pretrial period as the one report which was immediately disclosed. Once a court finds that there has been a refusal to comply with the discovery rules, the burden is on the noncomplying party to show that the refusal was reasonable. (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 587, 434 N.E.2d 511, 518.) One standard utilized by the courts in determining whether a party's conduct is unreasonable is whether "the conduct of the offending party seems to have been characterized by a deliberate and pronounced disregard for the rule or order not complied with." (*King v. American Food Equipment Co.* (1987), 160 Ill. App. 3d 898, 911, 513 N.E.2d 958, 966.) Counsel for the railroad conceded, and the trial court found, that his unconvincing and uncorroborated explanation for tendering one incident report without the others, whatever its merit, did not meet his burden of showing reasonable noncompliance. We agree. Thus, the question is whether the trial court abused its discretion in excluding the documents from evidence and from any use at trial, rather than granting plaintiff's motion for a mistrial.

Initially, we must address plaintiff's contention that once the court had barred the reports themselves, it should not have permitted Hahne to testify about the high priority of the area for police patrols and the diligence of the railroad police in surveillance and response to suspect activity, because the witness had the opportunity to refresh his recollection with these reports prior to trial, even if no reference to their content was permitted during the proceedings. Under Supreme Court Rule 219(c), such sanctions as are "just," may, under appropriate circumstances, include barring a witness from giving testimony which is reasonably related to the discovery violation. (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 587-88, 434 N.E.2d 511, 519.) However, under the facts of this case, we find that the court exercised sound discretion in permitting Hahne's general testimony on these matters after excluding the documents themselves. First, the trial judge correctly noted that it would have been impossible to prevent the witness, who had personally received, prepared, or signed at least four of the undisclosed reports, in addition to the disclosed document admitted as plaintiff's exhibit No. 21, from refreshing his recollection from his own files at any point in the past, although he was not allowed to do so at trial. Furthermore, all of Hahne's testimony was based on his 17 years of progressively responsible service with the C & NW police force, beginning with patrol duties in 1971 and including more than 10 years as police inspector. It was apparent from both his experience and his testimony that he was

thoroughly familiar with the entire area around Kedzie, Belmont and the Avondale Yard during the relevant time period, with typical police encounters there, and with the full range of police procedures discussed. Thus, in all probability, his testimony would have been substantially the same had he never reviewed the excluded documents. Finally, although plaintiff's counsel argued this point in chambers, the railroad is correct in stating that he at no time moved to exclude Hahne's testimony. Nor did plaintiff's post-trial motion, which charged reversible error in the denial of a mistrial, suggest that the court erred by not excluding Hahne or some portion of his testimony. Consequently, this particular aspect of plaintiff's claim of error may considered waived. In any event, we find it meritless under the circumstances.

■■■ We turn then to the issue of whether the court erred in denying plaintiff's motion for a mistrial. It is well established that a decision whether or not to grant a mistrial rests within the sound discretion of the trial court based upon the particular circumstances of the case. (*Benuska v. Dahl* (1980), 87 Ill. App. 3d 911, 913, 410 N.E.2d 249, 251.) As a general rule, a mistrial should be declared only as the result of some occurrence at trial of such character and magnitude that a party is thereby deprived of a fair trial. (*Benuska*, 87 Ill. App. 3d at 913, 410 N.E.2d at 251; *Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 359, 366 N.E.2d 327, 338.) The trial court's ruling on a motion for mistrial will not be disturbed on review absent a clear abuse of discretion. *Benuska*, 87 Ill. App. 3d at 913, 410 N.E.2d at 251; *Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 210, 398 N.E.2d 188, 195.

We have examined the 30 incident reports excluded from evidence after being disclosed for the first time during the presentation of defendants' case. All relate to incidents in the immediate vicinity of the accident, whether in the Avondale Yard, on the tracks near the yard, or on the tracks at Kedzie, Belmont, or Kimball Avenues. Most involve sightings of children or teenagers on railroad property, although a few pertain solely to adult trespassers. The earliest report is dated January 23, 1975, and the latest, June 20, 1978. The reports convincingly corroborate Hahne's statement that the railroad had a continual problem with trespassing in the area, from one year to the next. They also provide overwhelming evidence of notice and knowledge on the railroad's part, for more than three years prior to Daniel Colls' death, that youngsters of his age and younger were going up onto the elevated tracks. For example, the reports reveal that, in April 1975, two boys, 9 and 11 years old, were confronted on the

tracks at Kedzie Avenue, warned and released; in September 1976, two eight-year-old boys, found "playing on the bridge over Belmont Ave[nue]," were "almost struck by a northwest bound train," and were taken home to their parents by railroad police; in March 1977, a 10-year-old and an 11-year-old boy were found playing on the tracks and warned, as were three others, one of them 13 years old, one day later; in April 1978, passing trains reported "juveniles on the tracks," who had fled by the time that police arrived; and in May 1978, a juvenile was apprehended on the bridge at Kimball Avenue, but "got away."

In addition to the police incident reports, the stack of documents offered into evidence by the railroad included copies of 28 letters sent to the parents of the juveniles listed on those reports. During the period covered by the documents, four of the letters had been sent to parents in the 3300 block of North Troy, where the Colls resided, and two more were sent to parents in the adjacent block. During the same period, six letters were sent to parents on North Albany, all. of them residing within two blocks of the Quinn and Walsh families. Letters were also set to five sets of parents in the 3300 block of North Kedzie, where John Spaw resided.

Of course, notice to the railroad of trespassing children was not in dispute by the time this case went to the jury, notice and knowledge having already been established by the testimony of the railroad's own witness and conceded by its counsel. What plaintiff objects to is lack of access to these documents in formulating a trial strategy which she could pursue with confidence. For example, she argues that had she received the incident reports during the discovery phase, she might not have expended so much time and effort in establishing through neighborhood witnesses that the railroad had notice of the children and that it failed to respond to citizen complaints. Plaintiff's argument is well taken. The existence of these additional reports, embraced by interrogatories which the railroad answered under oath, as well as by plaintiff's request to produce, demonstrate C & NW's failure to comply with the requirements of full and frank disclosure imposed by our discovery rules. Illinois courts have held that fractional discovery and fractional disclosure are not to be tolerated. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 68, 374 N.E.2d 460, 468; *Hengels v. Gilski* (1984), 127 Ill. App. 3d 894, 905, 469 N.E.2d 708, 718.) Such partial disclosure, implying that there is no further information or evidence to be sought, "inevitably tend[s] to mislead opposing counsel into the belief that further inquiry is not needed." *Osten-*

*dorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282, 433 N.E.2d 253, 257.

Moreover, because discovery is supposed to enable counsel to decide in advance of trial not only what the evidence is likely to be, but also what legal issues can credibly be argued, our supreme court has condemned conduct which frustrates a plaintiff's attempts to formulate a theory of the case and a strategy for trial. (*Lubbers v. Norfolk & Western Ry. Co.* (1984), 105 Ill. 2d 201, 213, 473 N.E.2d 955, 961.) Here, C & NW may have purposely secreted evidence, the full import of which could have been investigated and addressed by plaintiff's counsel over the eight-year period between the discovery requests and the trial. We cannot fault plaintiff for any lack of diligence, as there was nothing in defendant's answers which would have suggested that similar highly relevant reports were also available. Furthermore, although the trial judge observed that purposeful withholding of the reports during discovery seemed inconsistent with the railroad's attempt to introduce the same evidence at trial, it is not inconceivable that, despite the risk of severe sanctions, a party's trial strategy might involve the surprise introduction of previously undisclosed documents in order to rebut the opposing party's theory of the case, having already precluded the opposing party from utilizing the same evidence in support of other viable arguments which could have been made. We therefore reiterate that such fractional and misleading disclosure violates the spirit and intent of the discovery process, should not be countenanced by the courts, and warrants the imposition of appropriately severe sanctions.

In the case at bar, plaintiff argues that the trial court's sanctions were insufficient to overcome the prejudice caused by the railroad's nondisclosure and the jury's brief observation of the stack of reports as they were handed to defense counsel. Defendant railroad maintains that the court's action in barring the reports from the courtroom, as well as any further reference to them or their content, not only deprived it of important evidence of police diligence, but also provided plaintiff with an important tactical advantage which it fully exploited. After asking Hahne to confirm that an incident report would have been prepared each time that an officer responded to a complaint, plaintiff's counsel suggested to the jury during closing argument that, despite Hahne's testimony to the contrary, the only report which the jury had seen was plaintiff's exhibit No. 21, which reflected the railroad's sole effort to respond to the complaints of neighbors and its own train crews. Thus, the exclusion provided plaintiff with an additional means of attacking the railroad's, and Hahne's, credibility.

■■■ ■ Our discovery procedures are meaningless unless courts unhesitatingly impose sanctions proportionate to the circumstances (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, 374 N.E.2d 460, 467), and a trial court, in exercising its discretion, may appropriately consider the need for using sanctions as "a general deterrent which will provide a strong incentive for *all* litigants to fully and accurately comply with the discovery rules." (Emphasis in original.) (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 588, 434 N.E.2d 511, 519.) Nonetheless, each case involving discovery sanctions presents a unique factual situation which must be considered in deciding which sanctions, if any, are "just" under the circumstances. We find that, under the particular circumstances of the instant case, the sanction imposed did not constitute a clear abuse of the court's discretion for several reasons. First, it was plaintiff who initially moved for exclusion of the documents, voicing a concern that some of them referred to the Avondale Yard and other areas, and should not be introduced to prove police diligence at the site of the accident. Thus, the court's sanctions were a direct response to plaintiff's own motion to have the reports barred. Furthermore, the judge's decision prevented the railroad from presenting some highly credible and material evidence in its own defense, while permitting plaintiff to attack the railroad's credibility. Finally, while we agree with plaintiff that she should have been able to investigate the reports and consider their full import in developing a trial strategy, we are not convinced that their nondisclosure and attempted introduction amounted to an occurrence that deprived plaintiff of a fair trial. If the jury had received these documents, or had heard testimony based on their content, reasonable jurors would have found considerable support in them for the railroad's claim that it was diligent in acting to protect the children in Daniel Colls' neighborhood from any dangerous conditions on its property. The jurors may also have concluded that any child who lived in the area must have appreciated the risks associated with being on the C & NW tracks, or that, in any case, neither warning signs nor a fence would have further deterred them. Of course, it is also conceivable that the jury may have inferred that the railroad should have attempted to do more, or should have tried other means of deterrence. However, regardless of how plaintiff may have utilized these documents in planning her trial strategy, the jury could not have found the railroad negligent for any act or omission without first finding that the plaintiff had established every element of her burden of proof, including Daniel Colls' presumptive or actual inability to appreciate the risk of being on the tracks and on the bridge. The general content of

the police incident reports and the letters, if used at a new trial, would have made such a finding even more unlikely than it was under the facts in evidence at this proceeding. The trial judge, being in the best position to weigh the appropriateness of the sanctions available, chose to grant plaintiff's motion to exclude and to deny her motion for a mistrial. Giving that decision due deference, we cannot conclude that it constituted a clear abuse of discretion. Accordingly, it will not be disturbed.

■■ Plaintiff next contends that the trial court erred by striking certain allegations in her complaint, and by limiting the issues instruction to only three claims of wrongful conduct: the railroad's failure to erect a fence and to post warning signs, and the city's failure to fence off its property. Initially, we consider the city's argument that plaintiff has waived any right to appellate review of the court's decision to strike certain subparagraphs of the complaint, relating to the city, because she failed to object at appropriate times during the trial proceedings and to voice any legal basis for her objections. Our review of the record, including the jury instructions conference, the post-trial motion and hearing, other conferences during the trial, and written memoranda of both parties, indicates that the plaintiff adequately stated her objections at the appropriate times, sufficiently apprised the trial judge of the legal grounds for her objections, and afforded him several opportunities to consider and reconsider these objections in light of the relevant case law. Therefore, plaintiff has not waived these objections on appeal, and we will address their merits.

Plaintiff argues that the trial court should not have stricken her allegations that the railroad failed to maintain "any guards or suitable personnel" to prevent children from playing on the tracks, and that the railroad failed to maintain the tracks so as to clear them of any debris or objects which would attract children. She further maintains that she was deprived of an opportunity to have the jury consider whether the city might have been negligent in not posting warning signs or clearing its property of wood and other debris which made the railroad tracks more attractive and the area more hazardous to children. In other words, she claims that the court's rulings improperly deprived her of the opportunity to demonstrate that there were other appropriate responses which defendants could have undertaken to remedy the dangerous conditions on the premises.

■■ ■ While it is well established that each party is entitled to have the jury instructed on matters reasonably raised by the evidence (*Sherman v. City of Springfield* (1969), 111 Ill. App. 2d 391, 409, 250 N.E.2d 537, 546; *Chambers v. Rush-Presbyterian-St. Luke's Medical*

*Center* (1987), 155 Ill. App. 3d 458, 467, 508 N.E.2d 426, 432), the question as to what issues have been raised by the evidence is within the discretion of the trial court (*Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 389-90, 502 N.E.2d 826, 838). Under the *Kahn* doctrine, the attractiveness of the condition on the premises no longer forms a basis for the defendant's liability to the child; however, where plaintiff can establish all the elements of the exception, "there is a duty upon the owner or other person in possession and control of the premises to *exercise due care to remedy the condition or otherwise protect the children from injury resulting from it.*" (Emphasis added.) (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 625, 126 N.E.2d 836, 842.) Appropriate ways of remedying the situation or protecting the children may, of course, extend beyond fencing and posting warnings.

▆ With these principles in mind, we turn to the specific allegations which were stricken and excluded from the issues instruction. We consider first plaintiff's allegation that the railroad "failed to maintain any guards or other suitable personnel" to prevent the children from playing on the tracks. It is our view that this allegation was properly stricken, as the evidence clearly established that the railroad maintained police officers who patrolled the area and attempted to prevent children from playing on the tracks. Although plaintiff's tendered issues instruction did rephrase this allegation as a failure to maintain "adequate security guarding and personnel," we feel that the court was within its discretion in framing an instruction which excluded it. We also note that plaintiff presented no evidence whatsoever to support a finding that the expense or inconvenience of posting a permanent guard at the Irene track segment would be slight in comparison to the risk to children.

With respect to the railroad's failure to maintain the tracks "in such manner to keep [them] free from objects which would attract children" to them, we also find no abuse of the court's discretion. Because a landowner does not have a duty to remove attractions from its property in order to guarantee the safety of potential child trespassers, this allegation reasonably could have been interpreted by the court as a misapplication of the law relevant to the case. We note, however, that clearing spikes from the tracks in heavily populated residential areas might properly be considered an appropriate means to remedy a dangerous condition, if the facts in evidence in a particular case supported that inference, which they did here. Therefore, while we find no error in the court's decision to eliminate the particular wording used from both the complaint and the issues instruction, we

do not hold that the court was bound by the applicable law to prevent jury consideration of the railroad's maintenance of its property so as to remove a risk to children.

Likewise, we find no abuse of discretion with regard to the court's decision to strike the allegations charging the city with failure to "keep its property free from such objects as would attract children to the *** railroad tracks." Also, while there was ample testimony regarding the wood and other debris left on the city's property and occasionally used by the children at play, any failure to properly maintain the area was an unlikely proximate cause of decedent's accident.

We do find merit in plaintiff's argument that if the city had a duty to fence, it also had a duty to warn. The trial judge, in framing the issues instruction, expressly stated that the only reason the city remained in the case, and the only reason that the question of the city's liability was being presented to the jury, was that, based on Illinois case law, the city might have a duty to fence its property under the circumstances. The city had consistently maintained that it had no duty at all under the *Kahn* doctrine, either to erect a fence or to employ any other measures to protect children from a dangerous condition on another landowner's property. The city's duty, if any, under the facts of this case, is predicated on two Illinois decisions, both of which involved children injured on railroad tracks adjacent to city property after crossing onto the right-of-way through a hole in a fence which the city had constructed and maintained. In *La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 478 N.E.2d 417, the city had a contractual obligation to the railroad to maintain the fence in good repair, which the evidence clearly established it had failed to do. In *Engel v. Chicago & North Western Transportation Co.* (1989), 186 Ill. App. 3d 522, 542 N.E.2d 729, the city had undertaken to construct and maintain a fence around an entire park and playground area which it operated. On one side, the park abutted railroad tracks, with the fence separating them from the city property. Evidence produced at trial established that the Chicago Park District was aware of the hole, considered the unrepaired fence a safety hazard, and knew that children used it to access the tracks. Despite work orders, the hole in the fence was never repaired. This court upheld a jury verdict against the city and in favor of the 12-year-old plaintiff, who climbed through the hole and, having watched railroad employees and others do so safely, was injured when he jumped down from a slow-moving train. The court cited the *La Salle* case as support for the city's duty to repair the park fence in order to prevent children's access to the trains.

Both *La Salle* and *Engel* could arguably be distinguished from the instant case, the former because the city had a contractual obligation to fence, and the latter because it had a common law duty to repair the fence it had voluntarily undertaken to build. Nevertheless, if we conclude as did the trial court, that the city in this case could have a common law duty under the *Kahn* doctrine to protect children against unreasonably dangerous conditions on the railroad's adjacent property, then we fail to see why that duty would be limited solely to fencing, simply because *La Salle* and *Engel* focused on that method of alleviating a hazard. In *Leone v. City of Utica* (1979), 66 A.D.2d 463, 414 N.Y.S.2d 412, *aff'd* (1980), 49 N.Y.2d 811, 403 N.E.2d 964, 426 N.Y.S.2d 980, a case cited in *La Salle* as authority for the city's duty to fence, although *Leone* was directly predicated upon well-settled New York law that "a city owes to those who use its parks a duty of ordinary care against foreseeable danger," rather than the section 339 or *Kahn* exception, the court stated:

> "The record sufficiently establishes that young children often played in the wooded area of the park west of the creek and it may fairly be inferred that the city was aware of that activity and made no effort to prevent it. Additionally, the city had knowledge of the location of the railroad tracks and that pathways in the park lead to those tracks. Certainly the jury may have found, in view of the foreseeable danger of serious injury presented by the location of the railroad tracks [citation], that the failure of the city to fence its playground or park, or to supervise the use of the park *or to take some other reasonable precaution to prevent or discourage children from going onto the railroad property*, constituted a lack of ordinary care [citations]." (*Leone*, 66 A.D.2d at 466-67, 414 N.Y.2d at 415, quoted in *La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 614, 478 N.E.2d 417, 421-22.)

We see no reason why posting warning signs would constitute such a "reasonable precaution" any less than building a fence.

While every decision made by the trial judge may not have been perfect with respect to the issues instruction, none did any substantial harm to plaintiff under all the facts. In order to have found defendants liable for any act or omission, the jury would have had to first find that plaintiff had proved every element contained in the burden of proof instruction, including the proposition relating to appreciation of the risk. Considering Daniel's age, the testimony about the speed of the commuter trains and the impact of passing trains on the environment, this was a substantial burden for plaintiff to meet. In

fact, while the trial judge correctly determined that the case had to be submitted to the jury under all the evidence, he stated to counsel that he would have found for the defendants on the basis of the appreciation factor. In the final analysis, the jury had the opportunity to consider the issue of the railroad's liability in terms of both failure to fence and failure to warn. It is highly unlikely that a jury would have found the railroad to have exercised due care in posting no warning signs on its own tracks and bridge, while finding the city negligent for not posting signs on the adjoining property. For these reasons, we find that any mistakes made in striking allegations or framing the issues instruction did no substantial harm to plaintiff and do not constitute reversible error under the facts of this case.

Plaintiff's final contention is that the trial court committed reversible error by permitting the railroad's continual characterization of decedent and other children as "trespassers." She points particularly to defense counsel's repeated references, during his opening argument, to trespassers and to the manner in which the railroad dealt with such individuals, and to police inspector Hahne's testimony, informing the jury of the illegality of trespassing on railroad property and the possibility of arrest and prosecution. Plaintiff correctly observes that the application of the *Kahn* doctrine does not depend on the injured child's status as a trespasser. In fact, the Illinois Supreme Court has expressly held that, since *Kahn*, "the common law categories of trespasser, licensee and invitee, as they pertain to an injured child's status, are no longer relevant in determining liability." (*Cope v. Doe* (1984), 102 Ill. 2d 278, 285-86, 464 N.E.2d 1023, 1027.) For this reason, the *Kahn* doctrine may be invoked when the injured child was invited onto the premises as well as when he ventured there without permission. (See, *e.g., Sampson v. Zimmerman* (1986), 151 Ill. App. 3d 396, 502 N.E.2d 846 (child visitor injured in defendant's home); *Friedman v. Park District* (1986), 151 Ill. App. 3d 374, 502 N.E.2d 826 (child injured while sledding in municipal park).) Plaintiff further maintains that use of the term "trespass" in the context of testimony about police surveillance, theft from boxcars, illegality, and the possibility of arrest strongly implied decedent's wrongdoing and misconduct, leaving "the unmistakable impression in the minds of the jury that Daniel Colls was a trespasser to whom the defendants owed no duty." She argues that the very essence of the term "trespasser" connotes criminality, and implies a status under which an individual has little, if any, legal recourse. Finally, she notes that, although "wilful" trespass on an elevated railroad track was a punishable offense in August 1978, under a Chicago ordinance (Chicago Municipal Code

§193—19 (1935), decedent was less than 13 years old at the time and had not yet reached the statutory age of criminal responsibility. (Ill. Rev. Stat. 1977, ch. 38, par. 6—1.) Thus, plaintiff asserts that the implication that he was engaging in a criminal act was both misleading and severely prejudicial.

 █ Having reviewed all of the evidence, we do not find plaintiff's argument persuasive. We agree that it is "the province and duty of the [c]ourts to see that every litigant has a fair trial, free from the prejudicial conduct of counsel who in argument undertakes to supply facts or inferences favorable to his or her client that are not based upon the evidence in the record." (*Schofield v. Crandall, Inc.* (1974), 24 Ill. App. 3d 101, 106, 319 N.E.2d 585, 588.) However, the record in this case clearly establishes that the conduct of counsel for the railroad, *i.e.*, his use of the terms "trespass" and "trespasser," was both supported by the evidence and nonprejudicial in its overall effect.

Initially, we observe that there is no question that Daniel Colls was a child trespasser as that legal status is defined by the weight of authority. Black's Law Dictionary defines "trespasser" as "[o]ne who intentionally and without consent or privilege enters another's property." (Black's Law Dictionary 1348 (5th ed. 1979).) Illinois courts have defined a trespasser as "one who enters the premises of the other without permission, invitation, or other right, and intrudes for some purpose of his own, or at his convenience, or merely as an idler (*Trout v. Bank of Belleville* (1976), 36 Ill. App. 3d 83, 87, 343 N.E.2d 261, 264-65), including even those on the premises of another by sufferance without permission or an express or implied invitation (*Illinois Central R.R. Co. v. Eicher* (1903), 202 Ill. 556, 560, 67 N.E. 376, 378). As the railroad notes, even the Premises Liability Act (Pub. Act 83—1398, eff. Sept. 12, 1984), which abolished the common law distinction between invitees and licensees, refers to the "trespassing child entrant" as a category of trespasser. (Ill. Rev. Stat. 1987, ch. 80, par. 303.) The testimony and other evidence in this case conclusively established the decedent was a child who entered upon C & NW's property without express or implied permission, invitation, or other right, for some purpose of his own. He was therefore a child trespasser, and neither the comments of defense counsel, nor the questions addressed to witnesses mischaracterized him or the other children as such.

Moreover, the substantial testimony in this case, as summarized herein, belies plaintiff's argument that a reasonable jury would have inferred that decedent, or any of his friends, was a juvenile delinquent

or criminal as those terms are generally understood by the layperson. In fact, the cumulative effect of the testimony, including that of the railroad's police inspector, was quite the opposite. The composite picture presented was that of a likeable 12-year-old who attended parochial school, liked to draw, and spent his summer days with neighborhood children, many of them younger than he, engaged in activities such as building tree houses on property less than two blocks from home, after asking his parents' permission. Not one witness, including Hahne, suggested that Daniel so much as threw a rock, much less vandalized railroad property, stole articles from boxcars, or engaged in any other criminal or delinquent act. We do not believe that the average juror would characterize playfully tampering with a locked railroad switch as meeting that description. We also note that the railroad's attorney, in posing questions to Hahne, characterized a "child trespasser" simply as "a youngster up there [on the tracks]." That description, followed by Hahne's explanation of appropriate and inappropriate ways of dealing with such children, could only have reinforced the idea that the railroad police were primarily involved in warning children against dangers to their own safety and protecting railroad property, not in scouting out child criminals. Furthermore, we find it difficult to imagine that a Cook County jury, drawing upon its own common sense and life experiences, including any knowledge of commuter trains and railroad tracks in residential neighborhoods, would translate comments about occasional incidents of arrest and adult boxcar thieves into a suggestion that Daniel Colls was a lawbreaker who deserved no remedy or recourse.

Finally, we observe that the trial judge exercised sound discretion in acting to prevent such an inference on the jury's part. He ruled that the word "Criminal" be deleted from the phrase, "Criminal Trespass to Land," before copies of plaintiff's exhibit No. 21, the police incident report, were distributed to the jurors. He refused to admit into evidence a sample letter from the railroad to the parents of a trespassing child, in part because the letter expressly referred to the child as "illegally trespassing on railroad property." And he declined to give IPI Civil 2d No. 120.01, which defines trespasser as "a person who goes upon the premises of another without permission or invitation" (IPI Civil 2d No. 120.01), correctly finding that the instruction was irrelevant to the law governing the case. (See *La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 618, 478 N.E.2d 417, 424; *Schranz v. Halley* (1983), 114 Ill. App. 3d 159, 162, 448 N.E.2d 601, 602-03.) Under the circumstances, it was plaintiff's strategy of highlighting the term "trespasser" during closing argument, as

a means of suggesting that the railroad had tried to cast Daniel as some sort of "juvenile delinquent" by using that term, which may have served to refocus the jury's attention on the negative aspects and possible criminal connotations of decedent's legal status. In any case, we believe that neither the railroad's nor plaintiff's use of the term "trespasser" could have misled or confused a jury who heard the totality of the evidence and responsibly considered that evidence in light of the instructions. Nor is it likely that any prejudice resulted which affected the verdict. Therefore, we hold that the trial court did not err in permitting use of the term, "trespasser," during the course of the trial, and did not abuse its discretion by denying plaintiff's motion for a mistrial on that ground.

Having carefully reviewed the record, we find that the trial court committed no reversible error in the conduct of the trial. Accordingly, we find no reason to disturb the jury's verdict. The verdict in favor of defendants is affirmed.

Affirmed.

LORENZ, P.J., and COCCIA,* J., concur.

---

*Justice Michel A. Coccia participated in oral argument prior to his assignment to another division.